PATHWAYS, INC., Appellant,

v.

Brenda HAMMONS, Appellee.

No. 2001–SC–0626–DG.

Supreme Court of Kentucky.

Aug. 21, 2003.

Nolan Carter, Jr., Ronald L. Green, Todd P. Kennedy, Boehl, Stopher & Graves, Lexington, Counsel for Appellant.

William J. Gallion, Bruce D. Gehle, William Gallion and Associates, PLLC, Lexington, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellee, Brenda Hammons, was sexually assaulted while a resident at Moore's Boarding Home in Lexington, Kentucky. At the time, Hammons was a client of Appellant, Pathways, Inc., and had been placed at Moore's by Pathways. Hammons filed suit against Pathways, et al., claiming that Pathways was negligent in placing her at Moore's. In response, Pathways moved for summary judgment on grounds that it owed no duty to Hammons. The trial court granted the motion without stating the reasons for its ruling. The Court of Appeals reversed. We granted discretionary review and reverse the Court of Appeals.

## I. Facts and Procedural History

Pathways is a private, non-profit corporation that offers psychiatric and social services for the mentally ill in a ten-county region of Eastern Kentucky. In 1998, it had approximately 575 employees.

Brenda Hammons suffers from a bipolar disorder and has a lengthy history of mental illness. She was a client of Pathways from 1982 through 1997.

In March 1996, Hammons was discharged from Eastern State Hospital in Lexington, Kentucky, and returned to West Liberty, Kentucky, where she took up residence with her ex-husband. At the same time, she contacted Pathways to seek out its services. Hammons was placed on case management services, which meant that she received assistance from Pathways to help her remain in the community. Her case was assigned to Kimberly Royse, who was an Adult Mental Health Case Manager employed by Pathways.

Royse first assisted Hammons in getting an air conditioner for the trailer where she was living. Next, in July 1996, after Hammons explained that she was having trouble living with her ex-husband, Royse assisted her in completing an application for an apartment. Hammons' application was accepted, but she refused to take possession. Royse's next contact with Hammons occurred on November 4, after Hammons was discharged from Our Lady of Bellefonte Hospital in Ashland, Kentucky. This time, Hammons was no longer living with her ex-husband and needed immediate help in finding a place to live.

Based on Hammons' history, Royse did not believe that she would be able to place Hammons in any housing in the immediate area. Therefore, she consulted a list of boarding homes near West Liberty to find a placement for Hammons. The list had been circulated by the Cabinet for Human Resources in 1992, was woefully out of date, and had been compiled before the Commonwealth began maintaining a list of registered boarding homes, *i.e.*, boarding homes that met minimum health and safety regulations established by the Cabinet for Health Services. Unfortunately, Royse's first choice, Moore's Boarding Home in Lexington, was operating in violation of a court order that it cease operations. Moore's was not included on the then-current list of boarding homes registered with the Commonwealth that had been circulated to Pathways by the Department of Health. Royse phoned Moore's, which agreed to take Hammons as a resident.

Before Hammons could be transported to Moore's, she became hostile and threatened some of Pathways' staff. As a result, she was admitted to the psychiatric unit of King's Daughters Hospital in Ashland on November 6. Upon Hammons' admission

to King's Daughters, Russ Damron, a psychiatric social worker, began looking for a place for Hammons to reside after her release. Damron testified that this was a standard procedure and part of Hammons' treatment. After he had exhausted all the local options available to him, Damron contacted Pathways for assistance. Pathways informed Damron that a bed had been found for Hammons at Moore's. Damron contacted Moore's to confirm this and then arranged for Hammons to be transported to Moore's.

Hammons testified that two days after she arrived at Moore's, she was physically struck by Harry Stacy, who was also a boarder at Moore's. About a week later, on November 12, she arranged for friends to pick her up from Moore's and take her to the Appalachian Regional Hospital in West Liberty, where she admitted herself as a patient. She went from this hospital in West Liberty back to Lexington on November 19 when she was involuntarily committed for seventy-two hours to the psychiatric unit of the Eastern State Hospital.

During her commitment at Eastern State, Cecil Laster, Jr., a mental health specialist, attempted to persuade Hammons to go to a personal care home upon discharge. Laster testified that he believed that a personal care home was better equipped to meet Hammons' needs. He explained to her that a personal care home would see that she took her medication regularly and, further, while the monthly charges of a personal care home would exceed her SSI income, the Commonwealth would pay the excess amount and provide her with a $40.00 a month living allowance. Hammons refused to go to a personal care home and, instead, insisted on returning to Moore's.

Hammons testified that she returned to Moore's because she "didn't have [any] money and it was wintertime and she didn't know how to get to the Salvation Army." But her testimony does not contradict Laster's testimony that he attempted to persuade her to go to a personal care home rather than to return to Moore's. Nor did she testify that, prior to returning to Moore's, she sought assistance in finding another place to live. After her discharge from Eastern State on November 27, Hammons was transported at her request to Moore's. On November 30, she was sexually assaulted by Stacy, who later pleaded guilty to the assault. Subsequently, she filed suit against Moore's, its owners, Royse, and Pathways claiming damages in connection with Stacy's assault on November 30.

Pathways moved for summary judgment, which the trial court granted without comment. The Court of Appeals reversed on grounds that Pathways owed a duty to Hammons and that whether Stacy's assault was a legal cause of Hammons' injuries was a question of fact. We granted discretionary review, and reverse the Court of Appeals for the reasons stated below.

## II. Standard of Review

■ Because the trial court disposed of Hammons' claims against Pathways on summary judgment, in order to prevail on appeal, Pathways must show that there is no genuine issue of material fact and that it was entitled to judgment as a matter of law. CR 56.03. This is a negligence case, which requires proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury. *Mullins v. Commonwealth Life Insurance Co.*, Ky., 839 S.W.2d 245, 247 (1992), citing *Illinois Central R.R. v. Vincent*, Ky., 412 S.W.2d 874, 876 (1967). "Consequent injury" consists of what horn-

books separate into two distinct elements: actual injury or harm to the plaintiff *and* legal causation between the defendant's breach and the plaintiff's injury. *See Lewis v. B & R Corporation,* Ky.App., 56 S.W.3d 432, 436 (2001); David J. Leibson, Kentucky Practice, *Tort Law* § 10.2 (West Group 1995); William L. Prosser, *Law of Torts* (West 1976). Duty, the first element, presents a question of law. *Mullins,* 839 S.W.2d at 248. Breach and injury, are questions of fact for the jury to decide. *Lewis,* 56 S.W.3d at 438 (citing cases). The last element, legal causation, presents a mixed question of law and fact. *Deutsch v. Shein,* Ky., 597 S.W.2d 141, 145 (1980).

■ Thus, for Pathways to be entitled to judgment as a matter of law, it must show that (1) it was impossible for Hammons to produce any evidence in her favor on one or more of the issues of fact, *Steelvest, Inc. v. Scansteel Service Center. Inc.,* Ky., 807 S.W.2d 476, 483 (1991); (2) under the undisputed facts of the case, it owed no duty to Hammons, *see Ashcraft v. Peoples Liberty Bank & Trust Co., Inc.,* Ky.App. 724 S.W.2d 228, 229 (1986) ("If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence."); or (3) as a matter of law, any breach of a duty it owed to Hammons was not a legal cause of her injuries. *See id.*

## III. Discussion

Hammons argues that (1) Pathways owed her a duty to place her in a registered boarding home; (2) Pathways breached its duty when, through Royse, it placed her at Moore's, an unregistered boarding home; (3) she was injured when Stacy sexually assaulted her; and (4) Pathways' placement of her at Moore's was a legal cause of her injuries. On appeal, Pathways makes alternative arguments as to why it was entitled to summary judgment. First, it argues that it owed no duty to Hammons. Next, Pathways argues that, even if it owed a duty to Hammons and it breached that duty, the breach was not a legal cause of Hammons' injuries as a matter of law. We discuss these arguments in turn.

### Duty

■ Pathways argues that it owed absolutely no duty to Hammons because she was free to reject or accept Royse's placement of her at Moore's. In light of Pathways' mission and the nature of the services it renders to some of the most vulnerable members of society, we find the argument repugnant. It diminishes the fragile social compact upon which civilization is built to the amorality of caveat emptor. But not only is Pathways' argument morally indignant, it is wrong as a matter of law. Negligence focuses on the conduct of the defendant, not on the free will of the plaintiff. *See* Leibson, § 10.1. We reject Pathways' argument and turn to the question of whether Pathways owed a duty to Hammons, which we determine *de novo* because duty presents questions of law and policy.

"The most important factor in determining whether a duty exists is foreseeability." Leibson, § 10.3.

As a concept, foreseeability defies easy definition. In an oft-quoted case on the subject, Judge Cardozo stated that the "risk reasonably to be perceived defines the duty to be obeyed." *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928). But the longevity of this characterization rests largely on its conciseness and its generality. As a guide, it is little more than a head shake indicating "thataway." The Restatement (Second) of Torts provides a more detailed and, consequently, a more prosaic road map to

foreseeability. By using the Restatement (Second) to chart the way, we conclude that Pathways did owe a duty to Hammons.

■ Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence. "The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory, *knowledge of other pertinent matters,* intelligence, and judgment as a reasonable man would have." Restatement (Second) of Torts § 289(a) (emphasis added); *see also Mitchell v. Hadl,* Ky., 816 S.W.2d 183, 186 (1991). (Holding that liability for negligence is based on what the defendant was aware of at the time of the alleged negligent act and not on what the defendant should have known in hindsight.) The term "knowledge of pertinent matters" is explained by Restatement (Second) of Torts § 290, which states:

> For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is required to know (a) the qualities and habits of human beings and animals and the qualities, characteristics, and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community; and (b) the common law, *legislative enactments,* and general customs in so far as they are likely to affect the conduct of the other or third persons.

(Emphasis added).

Applying the above principles, Pathways was required to know, at the time it placed Hammons at Moore's, that boarding homes are regulated by the Commonwealth. In general, this regulation establishes minimum health and safety standards for boarding homes and was enacted for the protection of "boarders," *i.e.,* persons who reside in boarding homes. KRS 216B.300 *et seq.;* 902 KAR 20:350. These protections are assured through mandatory registration—under penalty of law—by all boarding homes as defined by KRS 216B.300(4) with the Cabinet for Health Services. KRS 216B.305(1). This means that the foreseeable risks of placing Hammons in an unregistered boarding home were defined by the risks to boarders' health and safety that registration was enacted to avoid. A review of the applicable statutes and regulations reveals that Stacy's assaults fell within the scope of foreseeable risk.

In order to be registered, a boarding home must maintain minimum standards of cleanliness and sanitation. KRS 216B.305; 902 KAR 20:350. Registration subjects a boarding home to annual, unannounced inspections to determine whether "the boarding home is in compliance with Administrative regulations relating to the operation of boarding homes ... and [a]ll applicable local health, fire, building, and safety codes and zoning ordinances." KRS 216B.305(3). Additionally, boarders have the right to "be free from mental and physical abuse." KRS 216B.303(4). Failure to comply with the minimum statutory and regulatory standards, which specifically include the protection of boarders' statutory rights, *see* 902 KAR 20:350(9), results in the denial of a boarding home's registration.

Thus, Pathways' "knowledge" of the legislation and regulation of boarding homes means that it should have realized that placing Hammons at an unregistered boarding home created the risk that she would be in a physically unsafe and/or unsanitary environment. This included the specific risk that Hammons would suffer physical and/or mental abuse. And it takes only a short step to intuit that one

boarder or boarders acting against another is a likely source of this risk. Thus, that Hammons might be assaulted by another boarder was a foreseeable risk of placing her in an unregistered boarding home. But standing alone, this did not create a duty for Pathways to place Hammons in a registered boarding home.

■ A risk foreseen has to be unreasonable before the defendant may be held liable for creating the risk. As explained by Restatement (Second) of Torts § 291:

> Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done.

Pathways' mission is to assist the mentally ill. This includes assistance with such things as budgeting, doing laundry, shopping, transportation, and applying for employment. In other words, Pathways helps the mentally ill to maximize their independence, their self worth and their value to society. There is great "utility" to this conduct as the term is used in § 291. *See* Restatement (Second) of Torts § 292(a). Additionally, locating housing for its clients furthers these goals and is also of great utility and social worth. But the manner in which Pathways performed its task of finding housing for Hammons was unreasonable.

While the utility of Pathways' efforts to find a place for Hammons to live was great, so was the risk and magnitude of harm in placing her at an unregistered boarding home. Pathways could have eliminated or greatly reduced this risk by keeping a current list of registered boarding homes and only placing their clients at boarding homes from this list. And significantly, the burden of doing so was slight.

The undisputed evidence shows that, starting in November 1995, the Department of Public Health sent Pathways regular, quarterly updates of boarding homes registered with the Commonwealth. Thus, in order to minimize the risk that Hammons would be placed in an unregistered boarding home, Pathways had to do little more than disseminate the current list to its case managers along with instructions to use only boarding homes on the list. In light of the risk and magnitude of harm in placing Hammons at an unregistered boarding home, it was unreasonable for Pathways to fail to take the simple and readily available steps that would have eliminated or greatly reduced that risk. *See* Restatement (Second) of Torts § 292(c); *see also United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947)

Therefore, we hold that Pathways owed a duty to Hammons to use the current list of registered boarding homes circulated to it by the Department of Health when Royse searched for a boarding home that would accept Hammons. Further, for the purposes of the following discussion on causation, we assume that Pathways breached this duty when Royse used a list of boarding homes that was years out of date to place Hammons at Moore's, which had never been registered with the Commonwealth and was operating in violation of a court order to cease operations.

### *Causation*

In *Deutsch v. Shein*, Ky., 597 S.W.2d 141, 143–44 (1980), we adopted the substantial factor test for causation set forth in § 431 of the Restatement (Second) of Torts, which is entitled "What Constitutes Legal Cause." This section states in pertinent part that the "actor's negligent conduct is a legal cause of harm to another if

his conduct is a substantial factor in bringing about the harm." Comment (a) to § 431 explains what is meant by "substantial factor":

In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent.... [T]his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

■■■■ Section 434 of the Restatement (Second) of Torts addresses the issues of when legal causation is a question of law for the court and when it is a question of fact for the jury. The court has the duty to determine "whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." § 431(1)(a). This standard is consistent with Kentucky law. See, e.g., McCoy v. Carter, Ky., 323 S.W.2d 210, 215 (1959). (Legal causation presents a question of law when "there is no dispute about the essential facts and [only] one conclusion may reasonably be drawn from the evidence.") See also 57A Am.Jur.2d, Negligence § 446 (1989). We add the caveat

that § 431(1)(a) must be construed in light of our seminal case on summary judgment, Steelvest, Inc. v. Scansteel Service Center, Inc., Ky., 807 S.W.2d 476 (1991). That is, in a summary judgment situation, the court must view all facts in the light most favorable to the non-moving party and all doubts must be resolved in that party's favor. See id. at 480. With this in mind, we turn to the question of whether reasonable minds could differ as to whether Pathways' placement of Hammons at Moore's was a substantial factor in causing the injuries that resulted from Stacy's assault on her.

In this discussion, it is important to note that Stacy assaulted Hammons twice: first on November 12, 1996, and next on November 30, 1996. The lawsuit, however, only concerns the second and more severe sexual assault. Thus, our discussion of legal causation concerns only whether Pathways' placement of Hammons at Moore's was a substantial factor in causing Stacy's second assault, and not whether it was a substantial factor in causing his initial assault. The essential facts concerning the second assault, as viewed in the light most favorable to Hammons, are as follows:

Hammons was a client of Pathways. She sought its assistance in finding a place to live. Royse found a place for her to live at Moore's Boarding Home in Lexington, which was a breach of Pathways' duty to use a current list of registered boarding homes when looking for one that would accept Hammons.

A few days after arriving at Moore's, Hammons was physically assaulted by Stacy. This put Hammons on notice that Moore's was not a safe place for her to live. She acknowledged this and affirmatively testified in her deposition that she knew that Moore's was dangerous and that she was afraid of Stacy. For reasons nei-

ther clear nor relevant, Hammons left Moore's and went to a hospital for treatment shortly after being assaulted by Stacy. Even though she knew that Moore's was dangerous and that Stacy was violent, she did not seek assistance in finding another place to live. Rather, upon being discharged from the hospital, she insisted on returning to Moore's. According to Hammons, she returned to Moore's because she had paid rent there through the month and because she was without money or means to go elsewhere. Accepting this as true (and ignoring the uncontroverted testimony that other viable housing options were available to Hammons when she was discharged from the hospital and that these options were strongly recommended to her), the risk that Hammons would feel compelled that she had no alternative but to return to a known dangerous environment, did not fall within, or even close to, the scope of risks created by Pathways' placement of Hammons at Moore's. In other words, Pathways' breach of its duty to Hammons was "remote and only furnishe[d] the occasion of [her] injury" and, consequently, reasonable minds could not differ as to whether Pathways' placement of Hammons at Moore's was a substantial factor in causing Hammons' injuries that resulted from Stacy's second assault. *Commonwealth, Dept. of Highways v. Graham*, Ky., 410 S.W.2d 619, 620 (1966). Therefore, we hold that Pathway's placement of Hammons at Moore's was not a legal cause of Stacy's second assault as a matter of law.

## IV. Conclusion

Pathways owed a duty to Hammons. But even assuming that Pathways did breach its duty, the breach was a not a substantial factor in causing the injuries for which Hammons is claiming damages in her action against Pathways. Thus, as a matter of law, Pathways cannot be held liable to Hammons for her injuries. The trial court properly granted Pathways' summary judgment motion, and the Court of Appeals erred in reversing that ruling. Therefore, we reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

LAMBERT, C.J.; COOPER, GRAVES, and WINTERSHEIMER, JJ., concur.

KELLER, J., concurs by separate opinion.

STUMBO, J., dissents by separate opinion.

Concurring Opinion by Justice KELLER.

I concur in the majority's conclusion that, although a jury could find that Pathways breached its duty to Hammons, Pathways' placement of Hammons at Moore's Boarding Home "was not a substantial factor in causing the injuries for which Hammons is claiming damages in her action against Pathways." [1] Accordingly, because Pathways' alleged breach of its duty was not a legal cause of Hammons' injuries, I concur in the majority's holding that the trial court properly granted summary judgment for Pathways. I write separately, however, because I disagree with the majority opinion's characterization of the duty that Pathways owed to Hammons.

The majority holds "that Pathways owed a duty to Hammons to use the current list of registered boarding homes circulated to it by the Department of Health when Royse searched for a boarding home that would accept Hammons." [2] In my view, this articulation of Pathways' duty is erro-

1. *Pathways, Inc. v. Hammons*, Ky., 113 S.W.3d 85, 93 (2003).

2. *Id.* at 91.

neous in its level of specification, which addresses itself more to a breach analysis than to a definition of the duty owed. In Kentucky, "[t]he rule is that every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury."[3] Although the majority correctly observes that legislative and administrative enactments help define the scope of risks foreseeable to an actor, and the record in this case establishes that Moore's Boarding Home was operating in violation of law, Pathways itself violated no law by placing Hammons in an unlicensed facility. And, "[s]ince this is not a case in which the relevant standard of care is supplied by [statute or] regulations, the duty owed ... must be defined by common law, *i.e.*, that degree of care exercised by reasonable and prudent"[4] mental health care service providers. In my view, the Court of Appeals appropriately characterized Pathways' duty when it stated, "Pathways is in the profession of providing services to mentally ill patients and owes a duty to render those services with reasonable care."

Dissenting Opinion by Justice STUMBO.

Respectfully, I must dissent from the majority's reversal of the Court of Appeals. I disagree with the Court's reasoning that although Appellant breached its duty to Appellee, the breach was not a substantial factor in causing the injuries to Appellee.

Appellant's professional relationship with Appellee began in 1982 after she was diagnosed as having bipolar manic depressive disorder. Appellee relied on Appellant to make decisions for her. Appellant knew or should have known that the severity of Appellee's mental disorder made it impossible for her to process choices, con-

sequences, and develop alternative solutions for her housing and financial needs. Appellee lacked the mental capacity to comprehend that if she returned to Moore's Boarding Home she may be harmed a second time. She trusted and relied upon Appellant to provide solutions including, a safe environment in which to live.

As stated in *Miller v. Mills*, Ky., 257 S.W.2d 520, 522 (1953).

We think it is clear that so far as foreseeability enters into the question of liability for negligence, it is not required that the particular, precise form of injury be foreseeable—it is sufficient if the probability of injury of some kind to persons within the natural range of effect of the alleged negligent act could be foreseen.

Appellant's failure to convey to Appellee the likelihood of harm and its failure to take steps that Appellee could not take for herself was negligence. Appellant's negligence created a situation that placed Appellee at risk for injury. A reasonable person would have recognized that placing Appellee in an unregistered, unlicensed boarding home where she had previously been assaulted placed her in harms way. Given that the offender, Mr. Stacy, was a resident at Moore's Boarding Home, the likelihood of a second assault was very high.

Because I believe the negligent acts of Appellant were a substantial factor in the injuries sustained by Appellee, I would affirm the decision of the Court of Appeals and remand the case to the trial court for further proceedings.

**3.** *Grayson Fraternal Order of Eagles v. Claywell*, Ky., 736 S.W.2d 328, 332 (1987).

**4.** *Carman v. Dunaway Timber Co. Inc.*, Ky., 949 S.W.2d 569, 571 (1997).