**File Name:  05a0976n.06**
**Filed:  December 14, 2005**

**No. 04-5340**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **TINA SMITH, et al.** | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| **Plaintiffs-Appellants,** | ) | **COURT FOR THE** |
| | ) | **EASTERN DISTRICT OF** |
| **v.** | ) | **KENTUCKY** |
| | ) | **(No. 3:03-CV-33)** |
| **NORTH AMERICAN STAINLESS, L.P., et al.,** | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |
| | ) | |

BEFORE:      MOORE, COOK, Circuit Judges; and GWIN, District Judge.[*]

Gwin, District Judge:

With this appeal, Plaintiff-Appellant Tina Smith and Intervening Plaintiff-Appellant

Kentucky Employers' Mutual Insurance appeal the district court's decisions granting summary

judgment to Defendants North American Stainless Limited Partnership ("NAS"), SMS Demag, Inc.,

Siemens Westinghouse Technical Services, Inc. and Siemens Energy and Automation (collectively,

"Siemens").  The lawsuit arises out of the July 2002 death of James Smith while performing welding

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

-1-

work at the NAS steel plant in Ghent, Kentucky. With their appeal, the Plaintiffs argue that the district court incorrectly found that (1) Defendant Siemens owed no duty of care to James Smith, thus stopping the Plaintiffs' negligence claim, and (2) Defendants NAS and SMS Demag were immune under the Kentucky Workers' Compensation Act. For the reasons that follow, we **AFFIRM IN PART AND REVERSE IN PART** the decision of the district court.

## I. Background

In 1999, Defendant SMS Demag contracted with Defendant NAS for SMS Demag to install a new furnace in the melt shop at NAS's Ghent, Kentucky plant. In turn, SMS Demag retained Artisan Mechanical as a subcontractor on the furnace project. On July 24, 2002, James Smith performed welding work on an electrode arm attached to a furnace at the Ghent plant. SMS Demag had recently installed the furnace. Smith worked for Artisan Mechanical. While Smith worked on the electrode arm, two Siemens engineers tested power breakers in another area of the plant.

As part of their testing, the Siemens engineers opened a breaker and removed shunts from the electrical line to trigger a power loss. The breaker linked to the electrode arm upon which Smith worked. The electrode arm was designed to retract and raise out of a melting structure in the event of a power loss. When the engineers operated the breaker, the electrode arms began to automatically rise. In the process, two of the arms crushed James Smith. On July 26, 2002, Smith died from the injuries he received in the July 24, 2002, incident.

On May 6, 2003, James Smith's widow sued the Defendants in state court in her individual capacity and as administratrix of her husband's estate. The complaint generally alleged that the Defendants were negligent in failing to monitor and inspect the accident area and to take adequate

safety precautions. After being served with the action, the Defendants removed the case to the U.S. District Court for the Eastern District of Kentucky. Kentucky Employers' Mutual Insurance paid benefits to the estate and intervened as a Plaintiff. In January and February 2004, the district court granted the Defendants' motions for summary judgment. This appeal followed.

## II. Legal Standard

This Court reviews a district court's grant of summary judgment *de novo*. *Holloway v. Brush*, 200 F.3d 767, 772 (6th Cir. 2000). Summary judgment is appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In seeking summary judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It is not sufficient for the nonmoving party merely to show that there is some

existence of doubt as to the material facts. *See id.*

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson*, 477 U.S. at 248. The factual dispute also must be genuine. The facts must be such that if proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* "The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322.

III. Discussion

On appeal, the Plaintiffs argue that the district court incorrectly found that (1) Defendant Siemens was not negligent and (2) Defendants NAS and SMS Demag have "up-the-ladder" immunity under the Kentucky Workers' Compensation Act. Defendant Siemens responds that it did not owe any duty to James Smith, or alternatively, that it satisfied its duty. Defendants NAS and SMS Demag both argue that they have up-the-ladder immunity.

*A. Negligence*

To state a claim of negligence under Kentucky law, a plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached its duty, and (3) the breach proximately caused the plaintiff's damages. *See James v. Meow Media, Inc.*, 300 F.3d 683, 689 (6th Cir. 2002), *cert. denied*, 537 U.S. 1159 (2003). Kentucky's courts recognize a "universal duty of

care" under which "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Id.* at 690. In deciding whether a duty of care exists, Kentucky's courts consider "whether the harm to the plaintiff resulting from the defendant's negligence was 'foreseeable.'" *Id.* "Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 90 (Ky. 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 289(a) (1965)).

Whether the defendant owed a duty of care to the plaintiff is a question of law. *See James*, 300 F.3d at 689. Whether the defendant breached its duty is generally a question of fact for the jury. *See Pathways*, 113 S.W.3d at 89. The Kentucky Supreme Court recognizes that the duty analysis is "essentially a policy determination." *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992). That policy determination "is but a conclusion of whether a plaintiff's interests are entitled to legal protection against the defendant's conduct." *Sheehan v. United Servs. Auto. Ass'n*, 913 S.W.2d 4, 6 (Ky. Ct. App. 1996).

### 1. Duty Of Care

In this case, the district court erred in determining that Siemens did not owe a duty of care to James Smith. In finding that Siemens owed no duty of care, the district court conflated the determination of whether a duty of care was owed with the determination of whether the duty was breached. As described above, Kentucky recognizes a broad universal duty of care, a duty to exercise care to avoid foreseeable injury to others.

In deciding whether harm was foreseeable, Kentucky courts look to the general foreseeability of harm, not whether the specific mechanism of harm could be foreseen. *See., e.g., Bolus v. Martin*

*L. Adams & Son*, 438 S.W.2d 79, 81 (Ky. 1969) ("It is not necessary to impose liability for negligence that the defendant should have been able to anticipate the precise injury sustained, or to foresee the particular consequences or injury that resulted. It is enough that injury of some kind to some person could have been foreseen."); *Eaton v. Louisville & N.R. Co.*, 259 S.W.2d 29 (Ky. 1953) (precise form of injury need not be foreseen). In deciding whether injury was foreseeable, we look to whether a reasonable person in a defendant's position would recognize undue risk to another, not whether such reasonable person recognized the specific risk to the injured party.

Both Siemens Engineers Hambrick and Warrick enjoyed experience in their field, both had more than 20 years of experience. With this experience, they could reasonably foresee that shutting down the power would result in consequences up-stream or down-stream. They knew the breaker they were testing was not an isolated unit, but, instead, was part of a larger system. They also knew that the breaker they were testing operated remotely by sending a signal to a remote location through a programmable logic controller that would react to the signal. Against this backdrop, it was foreseeable that work on the breaker could lead to dangerous conditions down-line. Finally, the Siemens engineers knew that there were other workers in the plant who could be affected.

Next, we decide whether Siemens owed a duty to Smith. Recall that the Siemens engineers understood that the breaker they were testing acted within a complete system and was not isolated. Also, the engineers operated through a remote connection and would send a signal to remote locations, including the programmable logic controller (the "PLC"). Siemens knew, or should have known, that this PLC would, by its very nature, direct responses to such signals. Although knowing that the breaker would send a signal to the PLC, they failed to investigate the potential ramifications

their actions would have on other equipment in the plant, including equipment controlled by the PLC. They failed to investigate despite knowledge that others were working at the plant.

In considering whether Siemens owed a duty, we examine Kentucky law. Kentucky's courts apply a broad concept of duty. Thus, in *Pathways, Inc. v. Hammons*, 113 S.W.3d 85 (2003), the Kentucky Supreme Court found the defendant owed a duty. In *Pathways*, a non-profit agency referred a mentally-ill woman to a rooming house. The rooming house previously enjoyed state accreditation, but lost the accreditation by the time of the referral. Nothing required the woman to go to the rooming house and no evidence showed that the non-profit agency knew of any danger at the rooming house. A fellow resident raped the woman. Rejecting the argument that the non-profit agency had no duty to insure a safe referral, the Kentucky Supreme Court explained: "Pathways' 'knowledge' of the legislation and regulation of boarding homes means that it should have realized that placing Hammons at an unregistered boarding home created the risk that she would be in a physically unsafe and/or unsanitary environment. This included the specific risk that Hammons would suffer physical and/or mental abuse." *Id.* at 90.

As reflected in the Siemens "lock-out" policy, a reasonable electrical contractor would recognize a significant risk to others within the plant occasioned by shutting the power off. We find that the district court erred in finding that Siemens owed no duty to Smith.

### 2. *Breach Of Duty*

As an alternative basis for summary judgment, the district court found that even if Siemens owed James Smith a duty of care, Siemens did not breach its duty. The issue of breach is generally a question of fact. *Pathways*, 113 S.W.3d at 89. However, if insufficient evidence supports a claim

that Siemens breached the duty that it owed to Smith, then the Plaintiffs' claims fail.

In negligence actions, the degree of care necessary to avoid injury to others depends largely on the circumstances and facts of each case. *French v. Gardeners & Farmers Market Co*., 122 S.W.2d 487, 489 (Ky. 1938). To avoid liability, a party must comport with the standard of conduct of a reasonable man under like circumstances. RESTATEMENT (SECOND) OF TORTS § 283(a).

We examine whether material facts support the Plaintiffs' claim that Siemens acted unreasonably in light of the circumstances it faced. Near June 25, 2002, NAS hired Siemens for limited duties - to perform testing on a breaker. Siemens did not provide or install the breaker or the attached programmable logic controller. SMS Demag provided the breaker. NAS agreed to pay Siemens $4,450 to perform the tests on the breaker.

Siemens had its own lock-out policy. That internal policy required the engineers to take certain precautions before the breaker testing, including ensuring that (1) electrical systems could not become inadvertently re-energized, (2) equipment connected to the breaker would not operate, and (3) moving machine parts were secured.[1] The policy also required the engineers to make sure

---

[1]Siemens' lock-out/tag-out policy says, in part:

> Hazardous energy sources include sources of stored or potential energy (capacitors, fly-wheels, elevated hydraulic equipment) as well as systems which can become activated unexpectedly while being serviced (hydraulic presses, motors, etc). This policy establishes the basic, minimum requirements for the Siemens lock-out/tag-out/try-out systems . . . .

> 9. A Zero Energy State is required to be verified when working on most equipment subject to Lock-out/Tag-out. When a lockout or tagout is applied, there may still be danger of injury from stored energy sources such as machine parts which could rotate, electricity, hydraulic pressure, chemicals, in pipes, steam, etc. All such stored energy sources must be placed in the Zero Energy State before the work is begun. This work is done by . . . [b]locking releasing or otherwise safely securing any parts or mechanisms which can still move or rotate due to gravity, springs, pressure, or other means.

that the breaker testing would not expose other plant personnel to injury. *Id.* The policy permits Siemens engineers to work on electrical systems when "it is safe and appropriate to do so" and when "clearly directed to so by the appropriate facility representative." *Id.*

Near the time of the accident, the Siemens engineers discussed their testing procedures with Peter Olanday, the on-site SMS Demag official. Repeating, SMS Demag was responsible for the design and programming of the NAS system. Olanday approved the testing procedures. When the engineers inquired whether the testing would affect any other plant personnel, Olanday "gave them the green light to perform the test." [J.A. 359, 406-8]. When the engineers began the testing, the breaker system was already de-energized. [J.A. 359, 363].

The Siemens employees responsible for the testing had little experience with the computer system. Larry Hambrick and Wayne Warrick performed the testing. Before July 24, 2002, Warrick had never been to the Plant. Hambrick had been to the plant about six times, but to a different part of the plant. Neither had worked on the switchgear involved with the accident on July 24, 2002.

After arriving on July 24, 2002, SMS Demag employee Peter Olanday took Hambrick and Warrick to the electrical room located in a sealed vault. The room had no windows. From the room, Hambrick and Warrick could not see the electric arc furnace or the electrode arms. They never saw Smith before the accident. Hired to test the switchgear, Hambrick and Warrick were unfamiliar with the design of the electric arc furnace and the programmable logic controller computer system.

When the engineers arrived, the power was not going through the switchgear. With the power out, Hambrick and Warrick prepared for the testing in the presence of Peter Olanday from

---

[J.A. 419].

SMS Demag. They explained to Olanday what they intended to do and that the breaker would be opened. "I asked him whether that would affect anyone on site. Olanday gave the green light to perform the test." [J.A. 359]. Hambrick testified:

> Q: Did you ask permission from Mr. Olanday?
>
> A: Yes.
>
> Q: Did you receive permission from him to go ahead with the work?
>
> A: Yes.
>
> Q: Was there any discussion you had with Mr. Olanday regarding how your work would affect other systems?
>
> A: There was — I briefly described what we would have to do to perform our tests.
>
> Q: Okay. Tell me what you told Pete.
>
> A: That the breaker would have to be operated.
>
> …. Q: And you covered what was going to take place during this test with Mr. Olanday?
>
> A: Yes.
>
> Q: And he agreed to have the work-up board?
>
> A: Yes.
>
> …. Q: What about the tests that you were going to do where you were opening and closing this breaker? Was there any discussion as to whether or not that part of the job would affect any other equipment within the plant?
>
> A: Yes.

Q:      Tell me about that conversation.

A:      It is a general statement from me to Mr. Olanday.  In order to perform our tests, we have to operate this breaker, open and close.  Will that affect anyone on site?

Q:      What were you told?

A:      No.  He went on to say that all, we are locked out all over the place was, I believe, his statement.

[J.A. 406-8].

After receiving Olanday's assurances that it was safe to test the breaker, Hambrick and Warrick began the test.  Hambrick and Warrick did not know that the breaker connected to the programmable logic controller computer system, or that the electrode arms would move if they operated the breaker switches.

Hambrick and Warrick told SMS Demag's employee Olanday of their proposed lock-out procedures and asked whether their testing would affect anyone: "There was - I briefly described what we would have to do to perform our tests . . . . That the breaker would have to be operated." [J.A. 356].  In response, Olanday gave no indication that operating the breaker would be unsafe. *Id.*

In *Tar Heel Coals, Inc. v. Turner Elkhorn Mining Co.*, 448 S.W.2d 385 (Ky. 1969), the Kentucky Supreme Court faced a somewhat similar fact pattern.  In *Tar Heels*, a truck ran into a coal conveyor built over a highway.  The Kentucky Department of Highways previously expressed no objection to the conveyor's placement. *Id.* at 388.  The Kentucky Supreme Court found the owner of the coal conveyor comported with a reasonable standard of conduct:

> In gauging whether any actor is negligent, the court must weigh the
> reasonableness of the conduct measured by the ordinary experience

> of mankind. Using this approach, we note that Turner was assured by the Department of Highways that its existing chute could and would be left in place over the highway to be constructed . . . . There is no suggestion that the Highway Department made any demand of Turner to do anything to protect the traveling public as regards the chute. It is apparent that the permitted encroachment was not 'manifestly unsafe.' It seems plain that a reasonably prudent person would act as Turner has acted in the premises in light of the facts which we have summarized.

448 S.W.2d at 388.

The Restatement of Torts describes this general rule that conduct must be reasonable in light of potential danger to others weighed against the likelihood of such danger: "'Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done." RESTATEMENT (SECOND) OF TORTS § 291 (1965).

Against this standard, we find insufficient evidence to show that Siemens did not comport with the standard of care owed to the public. In essence, Siemens only claimed negligence is relying upon the assurance given by SMS Demag's employee Olanday, a person with far greater knowledge regarding the relation of the circuit to safe operations of the facility. We find this insufficient to make out a deviation from the reasonable care owed to others within the community.

*B. Immunity*

The Kentucky Workers' Compensation Act provides injury coverage for employees and immunity from tort liability for employers with coverage for workers' compensation claims. The Act states that if "an employer secures payment of compensation as required by this chapter, the

-12-

liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer . . . . ” KY. REV. STAT. ANN. § 342.690(1) (2004).

The term “employer” includes contractors. *Id.* The Act defines “contractor” as follows: “A person who contracts with another . . . (b) [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupational profession of such person shall, for the purposes of this section be deemed a contractor, and such other person a contractor.” *Id.* § 342.610(2). If a defendant qualifies as a contractor, “it has no liability in tort to an injured employee of a subcontractor.” *Fireman’s Fund. Ins. Co. v. Sherman & Fletcher*, 705 S.W.2d 459, 461 (Ky. 1986).

Immunity under the Act thus extends “up-the-ladder” from the subcontractor that employs an injured person to the entities that contracted with the subcontractor. The immunity applies as long as (1) the injured person’s employer has workers’ compensation coverage, and (2) the up-the-ladder entities contracted “to have worked performed of a kind which is a regular or recurrent part of the work” of their business. *Id.* For purposes of immunity, “regular” means “customary or normal, or happening at fixed intervals,” while “recurrent” means “occurring again or repeatedly.” *Daniels v. LG&E*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996).

In the past, we have held that a contractor’s “regular or recurrent” work includes regular maintenance. In *Granus v. North Am. Philips Lighting Corp.*, 821 F.2d 1253 (6th Cir. 1987), the plaintiff sued for injuries he suffered while working at the defendant’s manufacturing facility. The plaintiff worked for a subcontractor that the manufacturer hired to replace firebricks in the defendant’s furnace. The plaintiff argued that the plant maintenance his employer performed was

outside the "regular or recurrent" work of the defendant. The district court held that the defendant manufacturer enjoyed up-the-ladder immunity, and we affirmed. In doing so, we held that routine maintenance on the furnace was a recurrent part of the defendant's business. The defendant was thus a contractor and immune from liability.

We reached a similar result in *Thompson v. The Budd Co.*, 199 F.3d 799 (6th Cir. 1999). There, the plaintiff worked for a company that the defendant hired to maintain its ventilation system. The plaintiff suffered injuries while working at the defendant's facility and sued. The district court granted the defendant's motion for summary judgment based on up-the-ladder immunity and we affirmed. We found that the Kentucky Workers' Compensation Act extends immunity to defendants who contract with others to perform routine maintenance or to help ensure compliance with government regulations. *Id.* at 805. We also held that immunity applies even where the subcontractor's work extends beyond the defendant's primary business objective. *Id.*

The plaintiffs cite *Cain v. General Electric Co.*, No. 2002-CA-1843, 2003 Ky. App. LEXIS 325 (Ky. Ct. App. Dec. 19, 2003), in support of their argument that NAS and SMS Demag lack up-the-ladder immunity. In *Cain*, the plaintiff suffered injuries while installing plumbing, insulation, and a furnace as part of the initial construction of the defendant's plant. The plaintiff worked for a company the defendant retained to perform the installation work. The trial court granted the defendant's motion for summary judgment based on up-the-ladder immunity, and the state appeals court reversed. The appeals court found that the initial installation during construction of the facility was not "a regular or recurrent part of [the defendant's] work of manufacturing household appliances." *Id.*, 2003 Ky. App. LEXIS 325, at *28.

*1. NAS*

NAS's primary business line is steel production. NAS uses furnace equipment during the production process. NAS contracts with other companies to install the equipment. In this case, NAS contracted with SMS Demag to provide and install equipment that would become the melt shop in the Ghent facility. [J.A. 178, 181]. Although melt shop equipment requires routine maintenance, NAS offers no evidence that it contracted with SMS Demag to provide such maintenance. Rather, SMS Demag contracted to provide and install the equipment.

Under these circumstances, we cannot say that NAS qualifies as a contractor for purposes of up-the-ladder immunity. This case is distinguishable from *Granus* because there, the defendant company contracted with the plaintiff's employer to provide a maintenance service that was performed "periodically." 821 F.2d at 1257. Here, the installation of the melt shop equipment appears to be a one-time affair. Although the equipment was necessary to NAS's business, its installation was not a regular or recurrent part of the business. We thus reverse summary judgment for Defendant NAS on the immunity issue.

*2. SMS Demag*

SMS Demag focuses primarily on producing and installing steel furnace equipment. SMS Demag agreed to provide and install such equipment at NAS's Ghent facility. SMS Demag routinely uses subcontractors to do the "heavy lifting" in its construction projects. In this case, the company contracted with James Smith's employer to install the equipment. James Smith suffered his fatal injuries in the course of providing those services to SMS Demag.

The Plaintiffs make two arguments regarding SMS Demag's right to "up-the-ladder"

immunity. First, the Plaintiffs argue that factual issues exist whether Artisan had entered a contract with SMS Demag to perform the work being performed at the time of the accident. Second, the Plaintiffs say that there is an issue of material fact as to whether James Smith was performing work regularly done by SMS Demag. Specifically, the Plaintiffs contend that SMS Demag installs plant equipment but evidence exists that Smith was killed during maintenance of the equipment, a function that the Plaintiffs say is not a regular SMS Demag responsibility.

In support of this argument, the Plaintiffs cite to the position taken by NAS and the evidence that NAS offers to support that position. NAS says SMS Demag, through its subcontractor Artisan, was performing maintenance work: "The work SMS subcontracted to Artisan was not construction work at all but, rather, maintenance and repair work that SMS was required to provide NAS until Provisional Acceptance . . . . " NAS brief at 8. While installation of equipment is a regular activity of SMS Demag, maintenance of already installed equipment is not. SMS Demag characterizes Smith's work as intimately related to its installation. The Plaintiffs and NAS say it was not. Factual issues exist over whether Smith's death occurred during installation or later maintenance and whether the work being performed by Smith and Artisan was a regular or recurrent part of SMS Demag's business.

We agree with a broad majority of the Dissent's discussion. We agree that the "up-the-ladder" immunity may extend more than one level. We also agree that "up-the-ladder" immunity can extend to a party even where the party never earlier performed the work with its own employees. Most important, we agree with the Dissent that "it is the contractual relationship between SMS Demag and Artisan and whether the work Smith was performing was a 'regular or recurrent' part

of SMS Demag's business that determines SMS Demag's immunity."

SMS Demag did not expressly contract to provide maintenance services for NAS. Section 1.1 of their agreement states:

> The Contractor [SMS Demag] has agreed to supply in Purchaser's [NAS] Manufacturing Facility the Equipment and all constituent elements necessary for the efficient operation of the equipment; the Erection of the Equipment; to supervise and direct the Commissioning and Provisional Acceptance of the Equipment.

Section 1.3 further states:

> The Project is the furnishing of the Equipment, together with installation, design, erection, supervision, and supervision and direction of the commission, and Provisional Acceptance Tests, and Training for the Equipment for which Contractor is responsible under the Contract Documents, including all professional design services, erection, supervision and all labor and materials required to perform the Work.

SMS Demag's written contract with Artisan was even less specific regarding the scope of work, calling only for Artisan to provide "LABOR AND MATERIAL FOR SITE TASK FORCE."

Under the contract, SMS Demag's work focused on installation, not maintenance. While SMS Demag says Artisan's work was installation, the Plaintiffs and NAS say it was maintenance. Smith was injured after the melt shop became operational and after hot runs had been performed but before SMS Demag received provisional acceptance. Smith was injured while working on insulators on the electrode arms of the electric arc furnace. At operating electric arc furnaces, insulators receive recurring maintenance and replacement. Work on insulators is not inherently tied to the initial installation of the equipment. At the time of the accident, the melt shop was operational and Artisan and Smith were not engaged in the original construction. The Plaintiffs-Appellants offer

evidence that Smith's and Artisan's work at the time of the accident was maintenance and that maintenance was not a regular or recurrent part of SMS Demag's business.

Again, under the Kentucky workers compensation scheme, a contractor is an entity who contracts with another to "have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person shall, for the purposes of this section be deemed a contractor, and such other person a subcontractor." KY. REV. STAT. ANN. § 342.610(2)(b) (2004). As Judge Merritt wrote, courts "narrowly constru[e] the immunity provisions" of Kentucky's workers' compensation regime. *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 658-59 (6th Cir. 1979). Under these circumstances, the parties' factual dispute over the work performed and contracted to by SMS Demag and Artisan creates a question of fact as to whether SMS Demag was a "contractor" for purposes of up-the-ladder immunity. That question of fact precludes summary judgment for SMS Demag.

Because there is an issue of fact as to whether SMS Demag qualifies as a contractor, we reverse the district court's decision granting summary judgment to SMS Demag.

IV. Conclusion

For the foregoing reasons, this Court **AFFIRMS** the decision of the district court to grant the motion for summary judgment of Defendants Siemens Westinghouse Technical Services, Inc., and Siemens Energy and Automation, and **REVERSES** the decision granting the motions for summary judgment of Defendants North American Stainless Limited Partnership and SMS Demag, Inc.

COOK, Circuit Judge, concurring in part and dissenting in part. I join the majority in its resolution and thorough analysis of Smith's negligence claim against Siemens. I differ, however, with the majority on the immunity issue; I would affirm the district court's judgment that NAS and SMS Demag qualify as "contractors" entitled to immunity under Kentucky's workers' compensation law. Because the majority views it differently, I must respectfully dissent.

**NAS and SMS are immune under Kentucky workers' compensation law.**

As noted by the majority opinion, Kentucky law imposes workers' compensation liability and immunity "up-the-ladder," from subcontractor to contractor. That is, if a subcontractor fails to secure coverage for its employees, the contractor can be held liable for the payment of compensation to the employees of the subcontractor. K.R.S. § 342.610(2). The reverse is likewise true; where a subcontractor has, in fact, secured payment for its injured employee according to the workers' compensation scheme, Kentucky law immunizes contractors "up-the-ladder" in the contractual chain from tort liability that would otherwise arise out of the same injury or death. K.R.S. § 342.690. With this burden to pay compensation when the direct employer does not secure it, and its reciprocal benefit of the exclusive-remedy bar to tort liability, Kentucky seeks "to prevent subcontracting to irresponsible people." *Elkhorn-Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101, 103 (Ky. 1976).

Both for purposes of liability and immunity, a "contractor" is "[a] person who contracts with another . . . [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person." K.R.S. § 342.610(2). The

statutory language applies easily in two-level, contractor/subcontractor cases—such as Smith's claim against SMS Demag: For SMS Demag to qualify as a contractor and consequently enjoy immunity, it must have contracted with Artisan (Smith's employer) to perform work that is a "regular or recurrent" part of SMS Demag's business. But the language does not fit as well when considering three-level, contractor/subcontractor/sub-subcontractor cases—such as Smith's claim against NAS. NAS never contracted directly with Smith's employer, Artisan – instead, it contracted SMS Demag to manufacture and install the melting furnace. SMS Demag, in turn, contracted Artisan to perform part of the installation work, including work necessary to ramp-up the newly-installed equipment to meet a service level promised by SMS Demag to NAS. The lack of direct contractual privity between NAS and Artisan alone, however, does not bar NAS from claiming the statutory immunity. Federal district courts have held that Kentucky's worker's compensation regime applies to relationships between contractors and the employees of their subcontractor's subcontractors—or, in other words, that liability and immunity proceeds "up-the-ladder" more than one "rung." *See Waterbury v. Anheuser-Busch, Inc.*, 2003 U.S. Dist. LEXIS 2639 (W.D. Ky. 2003) (finding a beer maker immune to a claim by an employee of a company charged with transporting $CO_2$ tanks—*four*-steps down the contractual chain); *Sharp v. Ford Motor Co.*, 66 F. Supp. 2d 867 (W.D. Ky. 1998) (finding a car maker immune to a claim by a employee of a sub-subcontractor). And Smith does not contend otherwise. In such cases, however, the relevant inquiry is not what the contractor (here, NAS) has contracted for with the first subcontractor (SMS Demag), but whether *the work performed* by the claimant is a) within the scope of the work contracted for between the original contracting parties (here NAS and

SMS Demag), and b) is a regular or recurring part of the contractor's business. *See Waterbury*, 2003 U.S. Dist. LEXIS 2639 at *5 (defendant had contracted for the supply of $CO_2$, but the key question was "whether the *delivery* of the . . . canisters was part of Anheuser-Busch's regular or recurrent business"(emphasis added)); *Sharp*, 66 F. Supp. 2d at 869 ("The only question that remains, then, is whether the work being performed by the plaintiff [was] 'a regular or recurrent part of [the defendant's business].'")

> *SMS Demag*. SMS Demag is entitled to immunity because it contracted with Artisan for work that was a "regular or recurrent" part of SMS Demag's business.

> In assessing SMS's immunity under K.R.S. § 342.690, we are looking up a single rung of the ladder—from Artisan to SMS Demag. As such, it is the contractual relationship between SMS Demag and Artisan and whether the work Smith was performing was a "regular or recurrent" part of SMS Demag's business that determines SMS Demag's immunity.

> The district court employed the proper analysis and found that a contractual relationship existed between SMS Demag and Artisan and that, at the time of the accident, Smith was performing work of a type that is regular or recurrent in SMS Demag's business. The contract between NAS and SMS Demag buttressed the district court's conclusion. SMS Demag contracted with NAS to "supply . . . all constituent elements necessary for the efficient operation of the [melt-shop] Equipment," to "Erect" such equipment, and to "supervise and direct . . . the Commissioning and Provisional Acceptance of the Equipment." SMS Demag also covenanted that the equipment it supplied would be "suitable for [NAS's] intended use . . . [and that it, SMS Demag, was] fully capable of . . . commissioning of the Equipment . . . within the tolerances

necessary for [its] efficient operation." The accident happened after the equipment was installed, but prior to NAS's provisional acceptance of the equipment, while the melt shop was still "ramp[ing] up" its operation to full (i.e., efficient) production. Since the contract required SMS Demag to commission—in the sense of "put into service"—the machinery to efficient production, and since the work that Smith was performing at the time of the accident was indisputably necessary to that task SMS Demag had contracted to perform for NAS, the work Smith was performing at the time of the accident was undoubtedly a regular or recurring part of SMS Demag's business.

The majority's resolution of the issue appears to turn on a distinction between whether the work performed by Smith at the time of the accident is properly characterized as "maintenance" or "installation". Specifically, the majority characterizes SMS Demag's contractual undertaking as limited to "installation" and excluding "maintenance." The actual agreement between NAS and SMS Demag, however, spells out a scope of work that cannot be so tidily compartmentalized. SMS Demag's contractual undertakings included the provisioning of labor and equipment necessary for the commission and efficient operation of the equipment up until the time of NAS's provisional acceptance. That necessarily included the replacement or repair of worn or defective subcomponents of the equipment, such as its electrode arms – at least until the time of NAS's provisional acceptance of the equipment.

The only "evidence" cited by the majority as creating a genuine issue of material fact as to whether Smith's work was a regular or recurrent part of SMS Demag's business is a statement from NAS's brief that "The work SMS subcontracted to Artisan was not construction work at all

but, rather, maintenance and repair work that SMS *was required to provide NAS until*

*Provisional Acceptance . . . .* " (Emphasis added.). While the majority apparently focuses on the

single word "maintenance" in that statement in setting up its distinction, it overlooks the more

important concept – that the work performed (no matter how it is labeled) was required by the

agreement between NAS and SMS Demag. Where, as here, SMS Demag directly contracted to

provide the services Smith was performing at the time of the accident, it necessarily follows that

those same activities were a "regular or recurrent" part of SMS Demag's business.

Finally, it is irrelevant to the analysis that SMS Demag may never have planned to

perform the work with its own employees. Contractors often do not perform the services that

they contract to deliver. But they are "on the hook" for such services and all that they require.

The Supreme Court of Kentucky addressed this scenario in *Fireman's Fund, Ins. Co. v. Sherman*

*& Fletcher*, 705 S.W.2d 459, 461 (Ky. 1986) where it held a company engaged in the business of

building construction was immune under K.R.S. § 342.690 from tort liability for injuries

suffered by a rough carpenter whose employer it had subcontracted. In reaching its conclusion,

the court rejected the claimant's objections that the defendant/building construction company did

not regularly do "rough" framing itself, but subcontracted the work to others, noting that "[e]ven

though he may never perform that particular job with his own employees, he is still a contractor

if the job is one that is usually a regular or recurrent part of his trade or occupation." *Id.* at 462.

Here, SMS Demag agreed to provide full-production equipment and to demonstrate that the

equipment was capable of operating at full production. Because it could not bring the equipment

up to its full production level (and thus perform its duties under the contract) without the work

that Smith performed at the time of his injury, SMS Demag implicitly was bound by its contract with NAS to perform that work. The services SMS Demag contracted to provide NAS are, by definition, regular or recurrent aspects of its work.

*NAS.* Although a closer question, I also conclude that Kentucky law and this court's earlier opinions on the issue counsel that NAS is immune from Smith's negligence suit under K.R.S. § 342.690. The majority bases its determination that NAS does not qualify as a "contractor" for purposes of immunity on its observation that the installation of the melt shop equipment is "a one time affair." Kentucky case law and the words of the statute itself, however, demonstrate that the "one-time" nature of an activity performed is not determinative of a party's status as a "contractor" for purposes of the statutory immunity. If the statute's definition of a contractor referred only to work that was a "recurrent" part of the contractor's business, I would reach a different conclusion. But, under the statute a contractor is a person who contracts for work that is a "*regular or* recurrent part" (emphasis added) of the contractor's business, and lest "regular" be rendered superfluous, it must mean something different than "recurrent." Regular can mean "happening at fixed intervals [or] periodic." But it can also mean "customary, usual, or normal," or even "proper." Webster's II New College Dictionary 934 (2001). The majority itself recognizes this with its citation to *Daniels v. LG&E*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996) for the proposition that "'regular' means 'customary or normal, *or* happening at fixed intervals,' while 'recurrent' simply means 'occurring again or repeatedly.'"(Emphasis added.)

Focusing on the term "regular", a firm would be a contractor if the practice in question were *typical* of its line of work, or perhaps even necessary to it, but the contractor would not

need to engage in the practice *repeatedly*. This understanding of "regular" jibes with common

usage: Amniocentesis is a "regular procedure" for pregnant women, even if most women

experience it only once. And stated more generally, a practice may be "regular" if it recurs

across persons, even if it never recurs within persons. The installation of equipment for melting

and casting steel is common and necessary *to the steel manufacturing business*; thus, the

majority is wrong to conclude that NAS did not contract for services that were a regular or

recurrent part of its business.[1]

In its analysis, the majority cites, and presumably takes guidance from the unpublished

Kentucky case of *Cain v. General Electric Co.*, 2003 Ky. App. LEXIS 325, at *29, No. 2002-

CA-001843-MR 2003 (Ky. Ct. App. Dec. 19, 2003) (unpublished). That case is pending appeal

before the Supreme Court of Kentucky (*GE Co. v. Cain*, 2005 Ky. Feb. 9, 2005) and comes with

the proscription that it is not final and shall not be cited as authority in any courts of the

Commonwealth of Kentucky. It also is distinguishable.

*Cain* essentially held that installation of plumbing, gas and water lines, piping, insulation,

flooring, furnaces and machinery removal by various subcontractors were not regular or

---

[1] A few of this Circuit's district court judges have adopted the narrower view espoused by the majority that one-time events do not meet the statute's definition of "regular or recurrent". See, *Sharp v. Ford Motor Co.,* 66 F.Supp.2d 867, 869 (W.D.Ky.1998). Even if I regarded it as proper to take this narrow view in applying Kentucky law, however, I would nevertheless reach the same conclusion. As the district court noted in this case, the evidence shows that the accident occurred when Smith was servicing the electrode arm of the installed equipment after installation and before ramp-up. The district court found that the work Smith was performing at the time of the accident – replacing insulators on the equipment's electrode arm – was akin to the maintenance work that was determined to be "regular or recurrent" in *Granus*. I see no fault in the district court's logic and no record evidence to dispute the validity of its factual finding. It certainly should not matter to the analysis that this was the first time the electrode arm had to be serviced in this manner.

recurrent aspects of the appliance manufacturing business. The *Cain* court took issue with the trial court's conclusion that because the work was "necessary to enable GE to manufacture its products" they were a regular or recurrent part of its work, pointing out as a logical extreme that the trial court's statements may lead to illogical results such as applying worker's compensation liability and the consequent immunity to employees of an independent accounting firm hired to audit a firm's financial records. *Id.* at fn.49. While the Supreme Court of Kentucky has the opportunity to more precisely delineate where the lines should be drawn in this analysis, it is doubtful that this is a case that lies near the margins. Installation of the steel melting furnace and performing related activities necessary for its commission and efficient operation is primary to the production of steel and the process of steel manufacturing. It is not merely tangential to the process as were the activities analyzed in *Cain* or that court's accounting-firm hypothetical. As the majority notes, "NAS's primary business line is steel production" and "the equipment was necessary to NAS's business." In *Giles v. Ford Motor Co.*, 126 Fed. Appx. 293, 296 (6th Cir. 2005) (Boggs, Martin, Weber) (per curiam) this court cited *Cain* for the limited proposition that "an activity must be entirely tangential to a company's main business to fall outside the terms of [the Kentucky Workers' Compensation Act]". I can find no reasoned basis to determine that Smith's activities at the time of his fatal accident were entirely tangential to NAS's business of steel manufacturing or for retreating from this court's prior reasoning on the subject.

Finally, I believe that the district court properly determined that Smith's work at the time of the accident was not only a regular and recurrent part of NAS's work, but it was also within the scope of the contractual relationship created between NAS and SMS Demag. As previously

-26-

discussed in my analysis of SMS Demag's immunity claim, the contract required SMS Demag to perform certain activities between the completion of the physical installation of the equipment and NAS's provisional acceptance of it. NAS had not yet provisionally accepted the equipment, and there was no legitimate contention that the work Smith was performing at the time of his accident fell outside of NAS's contractual obligation to ramp up the equipment to full production before NAS's provisional acceptance. Accordingly, whether the work Smith was doing at the time of the accident is characterized as maintenance or repair or troubleshooting or calibration or as a continuing aspect of the installation process, makes no difference. The work was clearly within the scope of the work that NAS contracted to SMS Demag and meets the requirements of K.R.S. § 342.690.

Because I find no error in the district court's conclusion that SMS Demag and NAS were "contractors" and entitled to immunity under the statute, I would affirm the court's grant of summary judgment to those parties.

---

[2]Smith seems to accept that the task performed by the decedent at the time of her husband's death was necessary to SMS Demag's commissioning of the melt-shop equipment. Smith maintains, however, that SMS Demag's post-installation duties were "one-time events," and thus could not constitute a "regular or recurrent" part of NAS's business, even if they included some measure of "maintenance". As explained below, the fact that a particular service is a "one-time event" for a particular business does not mean that it cannot constitute a "regular" part of that business. Moreover, Smith's focus – that the activity performed by her husband was a "one time event" focused on the fact that *Artisan* was required to perform these tasks on a one-time basis. The question, however, is whether that work is a regular or recurrent aspect of *NAS's* business, not Artisan's.