GWIN, District Judge:
With this appeal, Plaintiff-Appellant Tina Smith and Intervening Plaintiff-Appellant Kentucky Employers’ Mutual Insurance appeal the district court’s decisions granting summary judgment to Defendants North American Stainless Limited Partnership (“NAS”), SMS Demag, Inc., Siemens Westinghouse Technical Services, Inc. and Siemens Energy and Automation (collectively, “Siemens”). The lawsuit arises out of the July 2002 death of James Smith while performing welding work at the NAS steel plant in Ghent, Kentucky. With their appeal, the Plaintiffs argue that the district court incorrectly found that (1) Defendant Siemens owed no duty of care to James Smith, thus stopping the Plaintiffs’ negligence claim, and (2) Defendants NAS and SMS Demag were immune under the Kentucky Workers’ Compensation Act. For the reasons that follow, we AFFIRM IN PART AND REVERSE IN PART the decision of the district court.
I. Background
In 1999, Defendant SMS Demag contracted with Defendant NAS for SMS Demag to install a new furnace in the melt shop at NAS’s Ghent, Kentucky plant. In turn, SMS Demag retained Artisan Mechanical as a subcontractor on the furnace project. On July 24, 2002, James Smith performed welding work on an electrode arm attached to a furnace at the Ghent plant. SMS Demag had recently installed the furnace. Smith worked for Artisan Mechanical. While Smith worked on the electrode arm, two Siemens engineers tested power breakers in another area of the plant.
*701 As part of their testing, the Siemens engineers opened a breaker and removed shunts from the electrical line to trigger a power loss. The breaker linked to the electrode arm upon which Smith worked. The electrode arm was designed to retract and raise out of a melting structure in the event of a power loss. When the engineers operated the breaker, the electrode arms began to automatically rise. In the process, two of the arms crushed James Smith. On July 26, 2002, Smith died from the injuries he received in the July 24, 2002, incident.
On May 6, 2003, James Smith’s widow sued the Defendants in state court in her individual capacity and as administratrix of her husband’s estate. The complaint generally alleged that the Defendants were negligent in failing to monitor and inspect the accident area and to take adequate safety precautions. After being served with the action, the Defendants removed the case to the U.S. District Court for the Eastern District of Kentucky. Kentucky Employers’ Mutual Insurance paid benefits to the estate and intervened as a Plaintiff. In January and February 2004, the district court granted the Defendants’ motions for summary judgment. This appeal followed.
II. Legal Standard
This Court reviews a district court’s grant of summary judgment de novo. Holloway v. Brush, 220 F.3d 767, 772 (6th Cir.2000). Summary judgment is appropriate when the evidence submitted shows “that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). In seeking summary judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party’s case. Waters v. City of Morristown, 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. Daughenbaugh v. City of Tiffin, 150 F.3d 594, 597 (6th Cir.1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, “a complete failure of proof concerning an essential element of the nonmoving party’s case necessarily renders all other facts immaterial.” Celotex Cory. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. Matsushita Elec. Indus. v. Zenith Radio Cory., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. See id.
A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. Anderson, 477 U.S. at 248, 106 S.Ct. 2505. The factual dispute also must be genuine. The facts must be such that if proven at trial a reasonable jury could return a verdict for the nonmoving party. Id. “The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties’ differ *702 ing versions of the dispute at trial.” 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987) (citing First Nat’l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); see also Celotex, 477 U.S. at 322, 106 S.Ct. 2548.
III. Discussion
On appeal, the Plaintiffs argue that the district court incorrectly found that (1) Defendant Siemens was not negligent and (2) Defendants NAS and SMS Demag have “up-the-ladder” immunity under the Kentucky Workers’ Compensation Act. Defendant Siemens responds that it did not owe any duty to James Smith, or alternatively, that it satisfied its duty. Defendants NAS and SMS Demag both argue that they have up-the-ladder immunity.
A Negligence
To state a claim of negligence under Kentucky law, a plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached its duty, and (3) the breach proximately caused the plaintiff’s damages. See James v. Meow Media, Inc., 300 F.3d 683, 689 (6th Cir.2002), cert. denied, 537 U.S. 1159, 123 S.Ct. 967, 154 L.Ed.2d 893 (2003). Kentucky’s courts recognize a “universal duty of care” under which “every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.” Id. at 690. In deciding whether a duty of care exists, Kentucky’s courts consider “whether the harm to the plaintiff resulting from the defendant’s negligence was ‘foreseeable.’ ” Id. “Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence.” Pathways, Inc. v. Hammons, 113 S.W.3d 85, 90 (Ky.2003) (quoting Restatement (Second) of Torts § 289(a) (1965)).
Whether the defendant owed a duty of care to the plaintiff is a question of law. See James, 300 F.3d at 689. Whether the defendant breached its duty is generally a question of fact for the jury. See Pathways, 113 S.W.3d at 89. The Kentucky Supreme Court recognizes that the duty analysis is “essentially a policy determination.” Mullins v. Commonwealth Life Ins. Co., 839 S.W.2d 245, 248 (Ky.1992). That policy determination “is but a conclusion of whether a plaintiff’s interests are entitled to legal protection against the defendant’s conduct.” Sheehan v. United Servs. Auto. Ass’n, 913 S.W.2d 4, 6 (Ky.Ct. App.1996).

1. Duty Of Care

In this case, the district court erred in determining that Siemens did not owe a duty of care to James Smith. In finding that Siemens owed no duty of care, the district court conflated the determination of whether a duty of care was owed with the determination of whether the duty was breached. As described above, Kentucky recognizes a broad universal duty of care, a duty to exercise care to avoid foreseeable injury to others.
In deciding whether harm was foreseeable, Kentucky courts look to the general foreseeability of harm, not whether the specific mechanism of harm could be foreseen. See., e.g., Bolus v. Martin L. Adams & Son, 438 S.W.2d 79, 81 (Ky.1969) (“It is not necessary to impose liability for negligence that the defendant should have been able to anticipate the precise injury sustained, or to foresee the particular consequences or injury that resulted. It is enough that injury of some kind to some person could have been foreseen.”); Eaton v. Louisville & N.R. Co., 259 S.W.2d 29 (Ky.1953) (precise form of injury need not be foreseen). In deciding whether injury was foreseeable, we look to whether a *703 reasonable person in a defendant’s position would recognize undue risk to another, not whether such reasonable person recognized the specific risk to the injured party.
Both Siemens Engineers Hambrick and Warrick enjoyed experience in their field, both had more than 20 years of experience. With this experience, they could reasonably foresee that shutting down the power would result in consequences up-stream or down-stream. They knew the breaker they were testing was not an isolated unit, but, instead, was part of a larger system. They also knew that the breaker they were testing operated remotely by sending a signal to a remote location through a programmable logic controller that would react to the signal. Against this backdrop, it was foreseeable that work on the breaker could lead to dangerous conditions down-line. Finally, the Siemens engineers knew that there were other workers in the plant who could be affected.
Next, we decide whether Siemens owed a duty to Smith. Recall that the Siemens engineers understood that the breaker they were testing acted within a complete system and was not isolated. Also, the engineers operated through a remote connection and would send a signal to remote locations, including the programmable logic controller (the “PLC”). Siemens knew, or should have known, that this PLC would, by its very nature, direct responses to such signals. Although knowing that the breaker would send a signal to the PLC, they failed to investigate the potential ramifications their actions would have on other equipment in the plant, including equipment controlled by the PLC. They failed to investigate despite knowledge that others were working at the plant.
In considering whether Siemens owed a duty, we examine Kentucky law. Kentucky’s courts apply a broad concept of duty. Thus, in Pathways, Inc. v. Harris mans, 113 S.W.3d 85 (2003), the Kentucky Supreme Court found the defendant owed a duty. In Pathways, a non-profit agency referred a mentally-ill woman to a rooming house. The rooming house previously enjoyed state accreditation, but lost the accreditation by the time of the referral. Nothing required the woman to go to the rooming house and no evidence showed that the non-profit agency knew of any danger at the rooming house. A fellow resident raped the woman. Rejecting the argument that the non-profit agency had no duty to insure a safe referral, the Kentucky Supreme Court explained: “Pathways’ ‘knowledge’ of the legislation and regulation of boarding homes means that it should have realized that placing Hammons at an unregistered boarding home created the risk that she would be in a physically unsafe and/or unsanitary environment. This included the specific risk that Hammons would suffer physical and/or mental abuse.” Id. at 90.
As reflected in the Siemens “lock-out” policy, a reasonable electrical contractor would recognize a significant risk to others within the plant occasioned by shutting the power off. We find that the district court erred in finding that Siemens owed no duty to Smith.

2. Breach Of Duty

As an alternative basis for summary judgment, the district court found that even if Siemens owed James Smith a duty of care, Siemens did not breach its duty. The issue of breach is generally a question of fact. Pathways, 113 S.W.3d at 89. However, if insufficient evidence supports a claim that Siemens breached the duty that it owed to Smith, then the Plaintiffs’ claims fail.
In negligence actions, the degree of care necessary to avoid injury to others depends largely on the circumstances and *704 facts of each case. French v. Gardeners & Farmers Market Co., 275 Ky. 660, 122 S.W.2d 487, 489 (1938). To avoid liability, a party must comport with the standard of conduct of a reasonable man under like circumstances. Restatement (Second) of Torts § 283(a).
We examine whether material facts support the Plaintiffs’ claim that Siemens acted unreasonably in light of the circumstances it faced. Near June 25, 2002, NAS hired Siemens for limited duties — to perform testing on a breaker. Siemens did not provide or install the breaker or the attached programmable logic controller. SMS Demag provided the breaker. NAS agreed to pay Siemens $4,450 to perform the tests on the breaker.
Siemens had its own lock-out policy. That internal policy required the engineers to take certain precautions before the breaker testing, including ensuring that (1) electrical systems could not become inadvertently re-energized, (2) equipment connected to the breaker would not operate, and (3) moving machine parts were secured.[1] *******9The policy also required the engineers to make sure that the breaker testing would not expose other plant personnel to injury. Id. The policy permits Siemens engineers to work on electrical systems when “it is safe and appropriate to do so” and when “clearly directed to so by the appropriate facility representative.” Id.
Near the time of the accident, the Siemens engineers discussed their testing procedures with Peter Olanday, the on-site SMS Demag official. Repeating, SMS Demag was responsible for the design and programming of the NAS system. Olanday approved the testing procedures. When the engineers inquired whether the testing would affect any other plant personnel, Olanday “gave them the green light to perform the test.” [J.A. 359, 406-8]. When the engineers began the testing, the breaker system was already de-energized. [J.A. 359, 363].
The Siemens employees responsible for the testing had little experience with the computer system. Larry Hambrick and Wayne Warrick performed the testing. Before July 24, 2002, Warrick had never been to the Plant. Hambrick had been to the plant about six times, but to a different part of the plant. Neither had worked on the switchgear involved with the accident on July 24, 2002.
After arriving on July 24, 2002, SMS Demag employee Peter Olanday took Hambrick and Warrick to the electrical room located in a sealed vault. The room had no windows. From the room, Ham-brick and Warrick could not see the electric are furnace or the electrode arms. They never saw Smith before the accident. Hired to test the switchgear, Hambrick and Warrick were unfamiliar with the design of the electric are furnace and the *705 programmable logic controller computer system.
When the engineers arrived, the power was not going through the switchgear. With the power out, Hambrick and War-rick prepared for the testing in the presence of Peter Olanday from SMS Demag. They explained to Olanday what they intended to do and that the breaker would be opened. “I asked him whether that would affect anyone on site. Olanday gave the green light to perform the test.” [J.A. 359]. Hambrick testified:
Q: Did you ask permission from Mr. Olanday?
A: Yes.
Q: Did you receive permission from him to go ahead with the work?
A: Yes.
Q: Was there any discussion you had with Mr. Olanday regarding how your work would affect other systems?
A: There was — I briefly described what we would have to do to perform our tests.
Q: Okay. Tell me what you told Pete.
A: That the breaker would have to be operated.
Q: And you covered what was going to take place during this test with Mr. Olanday?
A: Yes.
Q: And he agreed to have the work-up board?
A: Yes.
Q: What about the tests that you were going to do where you were opening and closing this breaker? Was there any discussion as to whether or not that part of the job would affect any other equipment within the plant?
A: Yes.
Q: Tell me about that conversation.
A: It is a general statement from me to Mr. Olanday. In order to perform our tests, we have to operate this breaker, open and close. Will that affect anyone on site?
Q: What were you told?
A: No. He went on to say that all, we are locked out all over the place was, I believe, his statement.
[J.A. 406-8].
After receiving Olanday’s assurances that it was safe to test the breaker, Ham-brick and Warrick began the test. Ham-brick and Warrick did not know that the breaker connected to the programmable logic controller computer system, or that the electrode arms would move if they operated the breaker switches.
Hambrick and Warrick told SMS Demag’s employee Olanday of their proposed lock-out procedures and asked whether their testing would affect anyone: “There was — I briefly described what we would have to do to perform our tests.... That the breaker would have to be operated.” [J.A. 356]. In response, Olanday gave no indication that operating the breaker would be unsafe. Id.
In Tar Heel Coals, Inc. v. Turner Elk-horn Mining Co., 448 S.W.2d 385 (Ky. 1969), the Kentucky Supreme Court faced a somewhat similar fact pattern. In Tar Heel, a truck ran into a coal conveyor built over a highway. The Kentucky Department of Highways previously expressed no objection to the conveyor’s placement. Id. at 388. The Kentucky Supreme Court found the owner of the coal conveyor comported with a reasonable standard of conduct:
In gauging whether any actor is negligent, the court must weigh the reasonableness of the conduct measured by the ordinary experience of mankind. Using *706 this approach, we note that Turner was assured by the Department of Highways that its existing chute could and would be left in place over the highway to be constructed.... There is no suggestion that the Highway Department made any demand of Turner to do anything to protect the traveling public as regards the chute. It is apparent that the permitted encroachment was not ‘manifestly unsafe.’ It seems plain that a reasonably prudent person would act as Turner has acted in the premises in light of the facts which we have summarized.
448 S.W.2d at 388.
The Restatement of Torts describes this general rule that conduct must be reasonable in light of potential danger to others weighed against the likelihood of such danger: “Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done.” Restatement (Second) of Torts § 291 (1965).
Against this standard, we find insufficient evidence to show that Siemens did not comport with the standard of care owed to the public. In essence, Siemens only claimed negligence is relying upon the assurance given by SMS Demag’s employee Olanday, a person with far greater knowledge regarding the relation of the circuit to safe operations of the facility. We find this insufficient to make out a deviation from the reasonable care owed to others within the community.

B. Immunity

The Kentucky Workers’ Compensation Act provides injury coverage for employees and immunity from tort liability for employers with coverage for workers’ compensation claims. The Act states that if “an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer....” Ky. RevStat. Ann. § 342.690(1) (2004).
The term “employer” includes contractors. Id. The Act defines “contractor” as follows: “A person who contracts with another ... (b) [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupational profession of such person shall, for the purposes of this section be deemed a contractor, and such other person a contractor.” Id. § 342.610(2). If a defendant qualifies as a contractor, “it has no liability in tort to an injured employee of a subcontractor.” Fireman’s Fund. Ins. Co. v. Sherman & Fletcher, 705 S.W.2d 459, 461 (Ky.1986).
Immunity under the Act thus extends “up-the-ladder” from the subcontractor that employs an injured person to the entities that contracted with the subcontractor. The immunity applies as long as (1) the injured person’s employer has workers’ compensation coverage, and (2) the up-the-ladder entities contracted “to have worked performed of a kind which is a regular or recurrent part of the work” of their business. Id. For purposes of immunity, “regular” means “customary or normal, or happening at fixed intervals,” while “recurrent” means “occurring again or repeatedly.” Daniels v. LG & E, 933 S.W.2d 821, 824 (Ky.Ct.App.1996).
In the past, we have held that a contractor’s “regular or recurrent” work includes regular maintenance. In Granus v. North Am. Philips Lighting Corp., 821 F.2d 1253 (6th Cir.1987), the plaintiff sued for injuries he suffered while working at the defendant’s manufacturing facility. The plaintiff worked for a subcontractor that *707 the manufacturer hired to replace firebricks in the defendant’s furnace. The plaintiff argued that the plant maintenance his employer performed was outside the “regular or recurrent” work of the defendant. The district court held that the defendant manufacturer enjoyed up-the-ladder immunity, and we affirmed. In doing so, we held that routine maintenance on the furnace was a recurrent part of the defendant’s business. The defendant was thus a contractor and immune from liability.
We reached a similar result in Thompson v. The Budd Co., 199 F.3d 799 (6th Cir.1999). There, the plaintiff worked for a company that the defendant hired to maintain its ventilation system. The plaintiff suffered injuries while working at the defendant’s facility and sued. The district court granted the defendant’s motion for summary judgment based on up-the-ladder immunity and we affirmed. We found that the Kentucky Workers’ Compensation Act extends immunity to defendants who contract with others to perform routine maintenance or to help ensure compliance with government regulations. Id. at 805. We also held that immunity applies even where the subcontractor’s work extends beyond the defendant’s primary business objective. Id.
The plaintiffs cite Cain v. General Electric Co., No.2002-CA-1843, 2003 WL 22976682, 2003 Ky.App. LEXIS 325 (Ky.Ct.App. Dec. 19, 2003), in support of their argument that NAS and SMS Demag lack up-the-ladder immunity. In Cain, the plaintiff suffered injuries while installing plumbing, insulation, and a furnace as part of the initial construction of the defendant’s plant. The plaintiff worked for a company the defendant retained to perform the installation work. The trial court granted the defendant’s motion for summary judgment based on up-the-ladder immunity, and the state appeals court reversed. The appeals court found that the initial installation during construction of the facility was not “a regular or recurrent part of [the defendant’s] work of manufacturing household appliances.” Id., 2003 Ky.App. LEXIS 325, at *28.

1. NAS

NAS’s primary business line is steel production. NAS uses furnace equipment during the production process. NAS contracts with other companies to install the equipment. In this case, NAS contracted with SMS Demag to provide and install equipment that would become the melt shop in the Ghent facility. [J.A. 178, 181]. Although melt shop equipment requires routine maintenance, NAS offers no evidence that it contracted with SMS Demag to provide such maintenance. Rather, SMS Demag contracted to provide and install the equipment.
Under these circumstances, we cannot say that NAS qualifies as a contractor for purposes of up-the-ladder immunity. This case is distinguishable from Granus because there, the defendant company contracted with the plaintiff’s employer to provide a maintenance service that was performed “periodically.” 821 F.2d at 1257. Here, the installation of the melt shop equipment appears to be a one-time affair. Although the equipment was necessary to NAS’s business, its installation was not a regular or recurrent part of the business. We thus reverse summary judgment for Defendant NAS on the immunity issue.

2. SMS Demag

SMS Demag focuses primarily on producing and installing steel furnace equipment. SMS Demag agreed to provide and install, such equipment at NAS’s Ghent facility. SMS Demag routinely uses *708 subcontractors to do the “heavy lifting” in its construction projects. In this case, the company contracted with James Smith’s employer to install the equipment. James Smith suffered his fatal injuries in the course of providing those services to SMS Demag.
The Plaintiffs make two arguments regarding SMS Demag’s right to “up-the-ladder” immunity. First, the Plaintiffs argue that factual issues exist whether Artisan had entered a contract with SMS Demag to perform the work being performed at the time of the accident. Second, the Plaintiffs say that there is an issue of material fact as to whether James Smith was performing work regularly done by SMS Demag. Specifically, the Plaintiffs contend that SMS Demag installs plant equipment but evidence exists that Smith was killed during maintenance of the equipment, a function that the Plaintiffs say is not a regular SMS Demag responsibility.
In support of this argument, the Plaintiffs cite to the position taken by NAS and the evidence that NAS offers to support that position. NAS says SMS Demag, through its subcontractor Artisan, was performing maintenance work: “The work SMS subcontracted to Artisan was not construction work at all but, rather, maintenance and repair work that SMS was required to provide NAS until Provisional Acceptance.... ” NAS brief at 8. While installation of equipment is a regular activity of SMS Demag, maintenance of already installed equipment is not. SMS Demag characterizes Smith’s work as intimately related to its installation. The Plaintiffs and NAS say it was not. Factual issues exist over whether Smith’s death occurred during installation or later maintenance and whether the work being performed by Smith and Artisan was a regular or recurrent part of SMS Demag’s business.
We agree with a broad majority of the Dissent’s discussion. We agree that the “up-the-ladder” immunity may extend more than one level. We also agree that “up-the-ladder” immunity can extend to a party even where the party never earlier performed the work with its own employees. Most important, we agree with the Dissent that “it is the contractual relationship between SMS Demag and Artisan and whether the work Smith was performing was a ‘regular or recurrent’ part of SMS Demag’s business that determines SMS Demag’s immunity.”
SMS Demag did not expressly contract to provide maintenance services for NAS. Section 1.1 of them agreement states:
The Contractor [SMS Demag] has agreed to supply in Purchaser’s [NAS] Manufacturing Facility the Equipment and all constituent elements necessary for the efficient operation of the equipment; the Erection of the Equipment; to supervise and direct the Commissioning and Provisional Acceptance of the Equipment.
Section 1.3 further states:
The Project is the furnishing of the Equipment, together with installation, design, erection, supervision, and supervision and direction of the commission, and Provisional Acceptance Tests, and Training for the Equipment for which Contractor is responsible under the Contract Documents, including all professional design services, erection, supervision and all labor and materials required to perform the Work.
SMS Demag’s written contract with Artisan was even less specific regarding the scope of work, calling only for Artisan to provide “LABOR AND MATERIAL FOR SITE TASK FORCE.”
Under the contract, SMS Demag’s work focused on installation, not maintenance. *709 While SMS Demag says Artisan’s work was installation, the Plaintiffs and NAS say it was maintenance. Smith was injured after the melt shop became operational and after hot runs had been performed but before SMS Demag received provisional acceptance. Smith was injured while working on insulators on the electrode arms of the electric arc furnace. At operating electric arc furnaces, insulators receive recurring maintenance and replacement. Work on insulators is not inherently tied to the initial installation of the equipment. At the time of the accident, the melt shop was operational and Artisan and Smith were not engaged in the original construction. The Plaintiffs-Appellants offer evidence that Smith’s and Artisan’s work at the time of the accident was maintenance and that maintenance was not a regular or recurrent part of SMS Demag’s business.
Again, under the Kentucky workers compensation scheme, a contractor is an entity who contracts with another to “have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupational profession of such person shall, for the purposes of this section be deemed a contractor, and such other person a contractor.” Ky.Rev.Stat. Ann. § 342.610(2) (2004). As Judge Merritt wrote, courts “narrowly constru[e] the immunity provisions” of Kentucky’s workers’ compensation regime. Boggs v. Blue Diamond Coal Co., 590 F.2d 655, 658-59 (6th Cir.1979). Under these circumstances, the parties’ factual dispute over the work performed and contracted to by SMS Demag and Artisan creates a question of fact as to whether SMS Demag was a “contractor” for purposes of up-the-ladder immunity. That question of fact precludes summary judgment for SMS Demag.
Because there is an issue of fact as to whether SMS Demag qualifies as a contractor, we reverse the district court’s decision granting summary judgment to SMS Demag.
IV. Conclusion
For the foregoing reasons, this Court AFFIRMS the decision of the district court to grant the motion for summary judgment of Defendants Siemens Westinghouse Technical Services, Inc., and Siemens Energy and Automation, and REVERSES the decision granting the motions for summary judgment of Defendants North American Stainless Limited Partnership and SMS Demag, Inc.

. Siemens’ lock-out/tag-out policy says, in part:
Hazardous energy sources include sources of stored or potential energy (capacitors, fly-wheels, elevated hydraulic equipment) as well as systems which can become activated unexpectedly while being serviced (hydraulic presses, motors, etc). This policy establishes the basic, minimum requirements for the Siemens lock-out/tag-out/tryout systems....
9. A Zero Energy State is required to be verified when working on most equipment subject to Lock-out/Tag-out. When a lockout or tagout is applied, there may still be danger of injury from stored energy sources such as machine parts which could rotate, electricity, hydraulic pressure, chemicals, in pipes, steam, etc. All such stored energy sources must be placed in the Zero Energy State before the work is begun. This work is done by ... [b]locking releasing or otherwise safely securing any parts or mechanisms which can still move or rotate due to gravity, springs, pressure, or other means.
[J.A. 419],