NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0227n.06

No. 23-5606

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

May 31, 2024

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| DANNY RAY HENSLEY, as administrator of the estate of Danny Oscar Hensley, Deceased, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| HEATHER BOSSIO, et al., | ) ) | OPINION |
| Defendants-Appellants. | ) ) | |

Before: GIBBONS, BUSH, and MURPHY, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Randy Bowman raped and then killed Danny Oscar Hensley (Hensley) while both were incarcerated at the state-run Little Sandy Correctional Complex (LSCC) in Sandy Hook, Kentucky. The decedent's father, Danny Ray Hensley, filed this action under 42 U.S.C. § 1983, claiming that certain LSCC officials violated the Eighth Amendment by failing to protect his son from the attack and that their actions were negligent under state law. At trial, the magistrate judge granted a directed verdict in favor of all defendants on the Eighth Amendment claim and to all but one defendant on the negligence claim. On appeal, Hensley's father challenges several of the magistrate judge's evidentiary rulings and the directed verdict in favor of LSCC Classification and Treatment Officer Heather Bossio. For reasons that follow, we affirm.

**I.**

Much of this appeal concerns the Prison Rape Elimination Act (PREA), which Congress enacted in 2003. *See* Pub. L. No. 108-79, 117 Stat. 972 (2003); 42 U.S.C. § 30301, *et seq.* Under

PREA, prison officials must screen each inmate to determine whether he is at risk of sexual abuse. 28 C.F.R. § 115.41(a). Officials conducting a screening consider, among other things, the inmate's criminal history, whether the inmate "has prior convictions for sex offenses against an adult or child," and "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." *Id.* § 115.41(d)(5)–(7). The results of the assessment "inform housing [and] bed . . . assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Interpretive guidance from the Department of Justice provides that officials should aim to "keep [high-risk victim] inmates *as separate as reasonably possible* [from high-risk abusers]," with the caveat that "[t]he meaning of the term 'separate' is generally informed by the unique facts and circumstances of a facility." Nat'l PREA Res. Ctr., Frequently Asked Questions, https://www.prearesourcecenter.org/node/5166 (last visited Apr. 22, 2024). Whether prison officials complied with those directives was a central issue in the trial below.

The facts of the case are these. Hensley was 23 years old at the time of his death. In his short life, the decedent had been convicted of first-degree sexual abuse. He was serving his sentence at LSCC.

In that prison complex, inmates are assigned to one of ten dorms. In accordance with PREA standards,[1] LSCC officials consider each inmate's PREA classification when determining

---

[1] As a state-run institution, the LSCC is not required to comply with PREA. However, states that do not adhere to PREA standards or do not commit to spending 5% of DOJ grant funds to work toward compliance, lose 5% of federal funding allocated for prison purposes for each year they fail to comply with the statute. *See* 34 U.S.C. § 30307(e)(2)(A). The Kentucky Department of Corrections (KDOC) stated its intention to bring all state and local institutions into compliance with PREA in 2013, and the governor certified the state's compliance with PREA standards in 2016. *See* KDOC, *2013 PREA Annual Report* (Mar. 24, 2014), https://corrections.ky.gov/About/Documents/PREA/2018/2013%20KDOC%20PREA%20Annual%20Report%20-revised%206-19-14.pdf (last visited Apr. 22, 2024); Bureau of Justice Assistance, *FY 2016 Certification and Assurance Submissions* at 45, https://bja.ojp.gov/sites

housing assignments. Under LSCC policy, a high-risk victim cannot be assigned to the same cell as a high-risk abuser, but inmates with opposite classifications may be housed in the same dorm. Audits of the LSCC in 2013, 2015, and 2018 revealed that the prison's policies, including the rule permitting high-risk victims and abusers to be housed in the same dorm, complied with PREA.

Hensley's PREA screening indicated that he was both a high-risk victim and a high-risk abuser. In June 2016, he asked Bossio if he could be transferred to C-dorm. Bossio contacted Corrections Unit Administrator Lorie Conley, and Conley granted Bossio's request. Randy Bowman, age 63, was also housed in C-dorm. Bowman's PREA screening indicated that he was a high-risk abuser, and Conley was aware of his violent criminal history. Conley knew that Bowman lived in C-dorm, but she testified that she did not consider Bowman's PREA classification when granting Hensley's request to move to the same dorm because he and Bowman were not assigned to be cellmates.

On June 30, between 9:30 a.m. and 10:30 a.m., Bowman and Hensley approached Bossio and asked her if they could share a cell. Hensley explained to her that he felt safer in C-dorm and that Bowman was "looking out" for him. Bossio Test., R. 174, PageID 2619. The pair told Bossio that they had submitted a move sheet requesting to be cellmates but noted that their respective PREA classifications could be a hindrance. Bossio told them that "a high-risk abuser and a high-risk victim could not be housed" in the same cell under PREA, but that "they could live in C Dorm together and spend time together outside of their cells." Bossio Occurrence Rep., R. 54-6, PageID 598–99. Bossio reported that their response was "calm and understanding," and that they "thanked [her] and left together." *Id.*, PageID 599.

---

/g/files/xyckuh186/files/media/document/fy16-prea-certification-assurance-submissions.pdf (last visited Apr. 22, 2024).

Correctional Officer Derek Maggard supervised C-dorm from 8:00 a.m. to 4:00 p.m. that day. Maggard was required to "do rounds" of the dorm as part of his role, including checking the cells for "anything out of the ordinary." Maggard Test., R. 174, PageID 2664. When not conducting rounds, Maggard sat inside a control unit from which he could see the entire dorm. Maggard did not have access to inmates' PREA risk assessments, but he had a list of the dorm's cell assignments and knew that inmates were not permitted to enter a cell to which they were not assigned.

Hensley and Bowman briefly spoke with Maggard around 1:35 p.m. After that, the two inmates entered Bowman's cell. Shortly thereafter, during a walk-through of C-dorm around 2:05 p.m., Maggard noticed that "a little more than half the window" to the cell was covered with a towel. Maggard Test., R. 174, PageID 2673, 2675. The towel covering violated LSCC policy. According to Deputy Warden Paul Holbrook, a correctional officer who sees a towel over an inmate's window should tell the inmate to take it down, by alerting the inmate over the intercom or by knocking on the cell door. If the inmate refuses to remove the towel, the officer should "go up there and check and see if there is something going on." Holbrook Test., R. 174, PageID 2650.

That is what Maggard claims he did. According to his testimony, when he saw the towel covering the window to Bowman's cell, he knocked on the door, "look[ed] in the cell and [told Bowman] to take the towel down." Maggard Test., R. 174, PageID 2678. But video footage shows that Maggard did not knock on the door when he first saw the towel. Regardless, Maggard maintained at trial that he communicated with the prisoners and that the towel "came down pretty quick[ly] after [he] went by." *Id.*, PageID 2687–88. Also, Maggard testified that he did not see anything unusual in Bowman's cell at that time. A while later, Maggard walked by Bowman's

cell a second time. Video shows the towel was back up over the window, but Maggard claimed that he did not see it.

Approximately eighteen minutes after the second walk-through, Bowman approached Maggard and told him that "his partner was laying up there dead in the cell." *Id.*, PageID 2685. Maggard entered the cell, where the towel was still covering the window, and discovered Hensley lying face down. He was pronounced dead at 4:16 p.m., although medical examiners did not provide an estimated time of death. A preliminary autopsy report revealed that the cause of death was asphyxia caused by strangulation.

## A. Procedural Background

Hensley's father filed this action in January 2017, alleging that various officers, including Bossio, Conley, and Maggard, violated his son's Eighth Amendment rights by failing to protect Hensley from Bowman's attack. Hensley's father also alleged that the defendants were negligent under Kentucky law when they failed to reasonably protect his son from foreseeable injury inflicted by Bowman. Bossio moved for summary judgment several months later, and the district court denied the motion.

The parties consented to appearing before a magistrate judge, and the case proceeded to trial in May 2023. The defendants moved for a directed verdict at the close of evidence. The court entered a directed verdict in favor of all defendants on the Eighth Amendment claim, explaining that Hensley's father failed to establish that his son faced a substantial risk of serious harm. The court entered a directed verdict in favor of Bossio and Conley on the negligence claim because the officers had no duty to move Hensley to a different dorm. But the court denied the defendants' motion with respect to Maggard, explaining that "the issue of the towel in the window" created a factual dispute as to whether Maggard "breached a duty of care" to Hensley. Order on Mot. for J.

as a Matter of L., R. 175, PageID 2765–66.  The jury found that Maggard breached his duty, but that the breach was not a "substantial factor in causing harm to Hensley."  Jury Verdict, R. 165, PageID 2423.  The notice of appeal was timely filed.

## II.

### A.  Cumulative Error

On appeal, Hensley's father first argues for reversal based on claimed cumulative errors regarding admission of proof below.  We review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012).  A court abuses its discretion when it "applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact."  *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (citation and internal quotation marks omitted).  A district court's erroneous evidentiary ruling requires a new trial "only if it affects a party's substantial rights or if justice so requires."  *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015) (cleaned up).

#### 1.  Excluding Expert Witness Testimony

Three of the claimed errors relate to the court's exclusion of testimony from his expert witness, Cameron Lindsay.  Hensley's father notified the court that he intended to call Lindsay as an expert witness in October 2018, but just nineteen days before trial was scheduled to begin, Lindsay reported that he could not appear at trial because he was required to care for his elderly mother in West Virginia.  The court denied Hensley's father's request to permit Lindsay to testify remotely, but it granted the motion to continue the trial so that Lindsay could testify live.

Despite the continuance, Hensley's father requested remote testimony again after determining that Lindsay could not leave West Virginia.  The court denied the motion, explaining that while Lindsay could not testify live using a video transmission, the parties could record his

deposition and play the recording at trial. The parties conducted their recorded deposition of Lindsay in February 2023. Lindsay testified that Conley failed to comply with PREA when she placed Hensley and Bowman in the same dorm. Lindsay also testified that Bossio's knowledge of the two inmate's PREA classifications should have put her on notice that Hensley was vulnerable to attack from Bowman. Lindsay opined that Bossio should have "taken immediate action to separate the two inmates" when they asked her to room together. Lindsay Dep., R. 141, PageID 1668.

The defendants moved to exclude Lindsay's testimony, in part, because Lindsay did not disclose his opinions regarding PREA standards in his expert report, which violated Federal Rule of Civil Procedure 26(a)(2)(B). The district court agreed. And because counsel for Hensley's father failed to show that the improper disclosure was "substantially justified" or "harmless" under Federal Rule of Civil Procedure 37(c)(1), the court excluded Lindsay's entire deposition.

At a final pretrial conference, counsel for Hensley's father stated that he was not sure whether the court excluded Lindsay's testimony in full, or only the testimony related to PREA standards. The court confirmed that Lindsay's entire recorded testimony was excluded but stated that counsel could call Lindsay to testify at trial. Counsel responded that because he had not known before the conference that he could call Lindsay to testify, he was "forced to ask for a continuance." Pretrial Conf. Tr., R. 172, PageID 2476. The court denied the request, explaining that it would not further delay the trial because the parties had "been dealing with this issue of Mr. Lindsay's deposition testimony for at least six or eight months." *Id.*, PageID 2477.

### (a) Motion to Permit Remote Testimony

With regard to these pretrial rulings, the first claim on appeal is that the court erred when it denied the motion for Lindsay to testify remotely. We consider this argument bearing in mind

the background preference of the Federal Rules of Civil Procedure for live over remote testimony. *See* Fed. R. Civ. P. 43 advisory committee's note to 1996 amendment (explaining that "[t]he importance of presenting live testimony in court cannot be forgotten," as "[t]he very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling"). But the Rules grant district courts discretion to permit remote testimony using video transmission "[f]or good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a). Because the language of Rule 43 is permissive, a court may allow for remote testimony when the requesting party has satisfied the Rule's requirements, but it is not required to do so. *See Eller v. Trans Union, LLC*, 739 F.3d 467, 478 (10th Cir. 2013) ("Rule 43(a), which allows for remote testimony, is by its own terms permissive and not mandatory.").

That said, the court acted within its discretion by directing the parties to record Lindsay's deposition and play the recording at trial. Hensley's father argues that the court should have permitted remote testimony via video transmission because current technology provides appropriate safeguards to depose Lindsay live. But the court did not err by refusing to grant that specific request, especially considering the defendants' concerns about conducting a "document-intensive expert examination" over video. Order Denying Mot. for Remote Test., R. 127, PageID 1548. And contrary to Hensley's father's contention, the court was not required to grant his motion simply because good cause excused Lindsay's inability to appear live. Instead, the court accommodated Lindsay's "important role as caretaker for his aging parent" by permitting the parties to play the recorded deposition at trial. *Id.* The court's attempt to accommodate the needs of both parties was not an abuse of discretion.

**(b) Exclusion Under Rule 37**

Hensley's father next claims that the magistrate judge erred by excluding Lindsay's testimony after finding that Lindsay's expert disclosures were inadequate. Under Federal Rule of Civil Procedure 26(a)(2)(B), a party intending to present an expert witness must provide a written report listing, among other things, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them," and "(ii) the facts or data considered by the witness in forming them." Rule 26(e) requires that a party supplement its disclosures upon learning that the information contained in an expert report "is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

Rule 26's disclosure requirements "allow both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) (cleaned up). Consistent with the goal of preventing unfair surprise to the parties, we have held that expert witnesses relying on "normal general standards of their profession" need not disclose the standards supporting their opinions. *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). But where expert testimony is not based on common standards in a given field, testimony exceeding the report's scope may be excluded.

The court did not err in holding that Lindsay's expert report violated Rule 26 because the report did not disclose Lindsay's opinions regarding PREA. Much of Lindsay's deposition testimony discussed whether LSCC officials satisfied PREA's requirements. But Lindsay's export report mentions PREA only twice, and only in a cursory manner. The report focuses instead on the American Correctional Association's (ACA) Performance-Based Standards for Adult Detention Facilities, which, as Lindsay acknowledged in his deposition, differ from PREA standards and do not apply to the LSCC. Lindsay explained that he referenced the wrong standards

because he lacked complete information about the case when he prepared his report. But that is no excuse for the failure to supplement Lindsay's disclosures in the years between the filing of the report and his deposition.

However, the court erred in holding that the Rule 26 violation required excluding Lindsay's testimony in its entirety. Under Rule 37, a party who fails to comply with Rule 26's disclosure requirements for an expert witness may not use that witness at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). We consider several factors to determine whether to exclude evidence for failure to comply with Rule 26, including "the surprise to the party against whom the evidence would be offered," "the extent to which allowing the evidence would disrupt the trial," and "the importance of the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 397 (4th Cir. 2014)).

The court excluded Lindsay's testimony because the defendants were "clear[ly] prejudice[d]" by the inadequate disclosures in Lindsay's report. Order on Mots. in Lim., R. 151, PageID 2379. But the court failed to explain why that was the case, and it did not reference the *Howe* factors at all in its analysis. *But see Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (noting that a court is not required to "apply each [*Howe*] factor rigidly" in conducting a Rule 37 analysis) (citation and internal quotation marks omitted). Moreover, based on our review of the *Howe* factors, at least the portions of Lindsay's testimony unrelated to PREA's standards could have been admitted because the defendants were not surprised by that evidence, and admitting the pre-recorded testimony would not have disrupted the trial. *See Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 783–84 (6th Cir. 2003) ("Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety.").

But even if the court abused its discretion in excluding Lindsay's testimony, any error was harmless. "The harmless error standard 'calls for reversal when the appellate court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error.'" *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (quoting *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004)).

Hensley's father claims that excluding Lindsay's testimony affected the outcome of the trial because, if the evidence had been admitted, the jury could have found Maggard liable for negligence. To the extent Hensley's father claims that Lindsay's testimony supported his theory that Maggard breached his duty of care, he is correct. Lindsay testified that the LSCC prohibited inmates from covering their cell windows, and that Maggard should have entered Bowman's cell when he saw the towel and "ma[d]e the inmates take down the impediment." Lindsay Dep., R. 141, PageID 1674. But the jury agreed that Maggard breached his duty of care, so excluding Lindsay's testimony regarding that element was harmless. *See A.K. by and Through Kocher v. Durham Sch. Servs.*, 969 F.3d 625, 633 (6th Cir. 2020) ("Because the jury found Durham negligent, the Kochers cannot argue that [expert witness] testimony was needed to establish breach of a duty or causation. The jury found those elements without [the expert's] assistance.").

By contrast, Lindsay's testimony did not support Hensley's father's theory regarding causation, which was the reason why the jury awarded judgment in favor of Maggard. At trial, counsel for Hensley argued that by intervening, Maggard could have "ke[pt] [Hensley] alive if Maggard enforced the safety rules" and removed the towel when he passed by Bowman's cell. Closing Arguments, R. 175, PageID 2786. Lindsay's testimony that Maggard "could have stopped [Hensley's death] from happening" by removing the towel is consistent with that argument. Lindsay Dep., R. 141, PageID 1688. But the theory advanced by Hensley's father rests on the assumption that his son was still alive at the time Maggard walked by Bowman's cell. Critically,

there was no evidence from which the jury could draw that inference, and Lindsay testified that he "d[id] not know if [Hensley] had been killed" when Maggard passed by the cell. *Id.* at PageID 1709. In fact, Lindsay testified to the opposite effect: he stated that he believed Hensley's assault "was in progress of taking place or had already taken place" when Maggard conducted his rounds, which suggests that Hensley was already dead by the time Maggard could have intervened. *Id.* at PageID 1711. *Cf. Peterson v. Foley*, 559 S.W.3d 346, 350 (Ky. 2018) (awarding summary judgment to deputy jailers on claim that their negligent supervision caused the decedent's death, in part because "nothing in the record indicates [the inmate's] time of death").

Maggard's negligence could not have caused Hensley's death if Hensley was already dead when Maggard conducted his rounds, and Lindsay did not express an opinion as to when the death occurred. Because admitting Lindsay's testimony would not have "affected the outcome of the trial" with respect to the negligence claim, any error in excluding the evidence was harmless. *Morales*, 687 F.3d at 702 (quoting *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011)).

### (c) Motion to Continue

Hensley's father next argues that the court erred by denying his motion to continue the trial date so that Lindsay could testify. Trial courts enjoy broad discretion when managing their dockets in civil cases. *See Prime Rate Premium Fin. Corp. Inc. v. Larson*, 930 F.3d 759, 766 (6th Cir. 2019) ("Rule 40 simply says that each court 'must provide by rule for scheduling trials,' . . . [and] Rule 16 adds that a court may include a trial date in the required scheduling order." (citing Fed. R. Civ. P. 40, 16(b)(3)(B)(vi))). In reviewing the denial of a motion to continue, we consider "the totality of the circumstances . . . such as the timing of the request, the need for a continuance, and the prejudice that would result." *Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 21-3433, 2022 WL 874310, at *4 (6th Cir. Mar. 24, 2022).

The court's denial of Hensley's father's request was not an abuse of discretion. Notably, it made a significant effort to accommodate Lindsay's schedule. The court granted the prior request for a continuance so that Lindsay could appear live, and once Hensley's father claimed that live testimony was no longer a viable option, the court permitted the parties to record Lindsay's deposition. It was entirely reasonable for the court to avoid further delay by denying a continuance, especially given that Hensley's father asked for a continuance on the morning of trial. He attempts to justify the last-minute request because he was confused about the scope of the court's pretrial order excluding Lindsay's testimony. But he does not explain why he waited until the day of trial—almost three months after the order was entered—to clarify the scope of the court's ruling. Finally, refusing to continue the trial did not prejudice Hensley's father because it is unclear whether Lindsay would have appeared at trial if the court had granted extra time. Indeed, Hensley's father concedes that he had "previously shown that Lindsay was unavailable to testify live at trial." Appellant's Br. at 50. We therefore affirm.

### 2. Defendants' Proposed Exhibits

The next argument on appeal is that the court erred by admitting the defendants' proposed exhibits because their disclosures were inadequate under Rule 26, and because they did not provide copies of the exhibits. Under Rule 26(a)(3)(A)(iii), parties are required to provide "an identification of each document or other exhibit, including summaries of other evidence— separately identifying those items the party expects to offer" at trial. Trial courts may exclude evidence that is not properly disclosed under Rule 37(c)(1), unless the failure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). Courts also "enjoy great latitude" in levying sanctions against a party for failing to disclose evidence in accordance with the court's scheduling orders. *Columbia Gas Transmission Corp. v. Zeigler*, 83 F. App'x 26, 31 (6th Cir. 2003) (internal

citation and quotation marks omitted); *see* Fed. R. Civ. P. 16(f)(1)(C) (stating that a court "may issue any just orders" if a party "fails to obey a scheduling or other pretrial order").

Hensley's father concedes that testimony about only two of the defendants' exhibits challenged on appeal—PREA audit reports from 2015 and 2018—was admitted at trial. Reply Br. at 4. Thus, our review is limited to the court's ruling regarding those exhibits. *Cf. United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) (recognizing that defendant did not suffer prejudice from unlawful seizure where items seized were not introduced at trial).

The defendants filed a list of their proposed exhibits in November 2019, but their list did not mention the audit reports. And they did not revise the list or provide copies of their exhibits until February 2023, three months before trial, disregarding two of the court's scheduling orders directing them to do so in preparation for trial. Nonetheless, the court denied Hensley's father's motion to exclude the exhibits, explaining that his counsel had similarly failed to comply with pretrial orders, and that proceeding to trial without defense exhibits would prevent the case from being resolved fairly and without undue delay.

The court's ruling was not an abuse of discretion because the defendants' failure to disclose the exhibits was harmless. Hensley's father received notice that the defendants intended to use audit reports in February 2023, over three months before trial. He therefore had sufficient time to cure any surprise before trial began, and he does not claim to have experienced any added litigation burdens in responding to the late disclosure. Nor has he shown how admitting the testimony about the audits—and not the audits themselves—prejudiced the outcome of his case. That LSCC complied with PREA was not relevant to the negligence claim against Maggard, which was the only count submitted to the jury. Accordingly, even if the defendants' disclosure of the audits was untimely, admitting the evidence was harmless.

### 3. Hensley's PREA Classification

Hensley's father next contends that the magistrate court erred by admitting evidence of his son's PREA classification.[2]   Specifically, he challenges testimony from Conley that she remembered that Hensley's PREA assessment indicated that he was both a "high-risk victim and a high-risk abuser." Conley Test., R. 174, PageID 2603.  Hensley's father claims that the evidence should have been excluded as irrelevant under Federal Rule of Evidence 401 and unduly prejudicial under Rule 403.

Under Rule 401's "extremely liberal" standard, *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009), "[e]vidence is relevant if it has 'any tendency' to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence," *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (quoting *Dortch*, 588 F.3d at 400).  A court may exclude relevant evidence under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  We defer to a district court's relevance determination and "view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."

---

[2]  Hensley's father also challenges the court's denial of his motion in limine to exclude evidence of his son's prior convictions and disciplinary history at the LSCC.  Appellant's Br. at 59–67.  But because Hensley's prior convictions and disciplinary history were not introduced at trial, we will address his arguments regarding his classification as a high-risk abuser only.  To the extent Hensley's father's challenge is based on his attorney's remarks during opening statements, counsel's remarks are not evidence and so are not subject to the federal evidentiary rules.  *See* Opening Statements, R. 174, PageID 2555 (stating that "[Hensley] and Bowman may have had a homosexual relationship," that Hensley "may have been involved in other homosexual conduct in exchange for things in the past in prison," and that Hensley was "assessed a high-risk abuser.").  *See also United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990) (holding that prosecutor's mention of hearsay during opening statement did not violate Federal Rules of Evidence because "lawyers' opening statements are not evidence").

*United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (citation and internal quotation marks omitted).

Testimony concerning Hensley's PREA classification passes the "low bar for admission" under Rule 401 because Hensley's status was relevant in determining his housing assignment. *United States v. Adkins*, 744 F. App'x 292, 297 (6th Cir. 2018); *see* 28 C.F.R. § 115.42(a). Hensley's father contends that the evidence was irrelevant because Conley and Bossio testified that they do not consider an inmate's PREA classification when deciding his dorm assignment. But claims that prison officials should have protected Hensley from Bowman required consideration of whether the two could be housed in the same cell—not just whether they could be assigned to the same dorm. Specifically, the evidence was relevant to the claims against Bossio, whom Hensley's father claimed should have intervened further after she denied Hensley and Bowman's request to be cellmates but permitted them to remain in C-dorm. Presenting evidence of Hensley's PREA classification was therefore relevant to his father's claims, even if the information did not factor into his dorm assignment.

Additionally, Hensley's father was not unfairly prejudiced by admitting the evidence under Rule 403. Conley did not explain which factors under 28 C.F.R. § 115.41(d) resulted in Hensley's assessment as a high-risk abuser, nor did she mention specific information regarding his conviction or his sexual conduct while in prison that resulted in his classification. Because any prejudice was outweighed by the probative value of Hensley's PREA classification, the court did not abuse its discretion in admitting this evidence.

### 4. Motion for a New Trial

Finally, Hensley's father argues that the court erred by denying his motion for a mistrial. We review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Howard*,

621 F.3d 433, 458 (6th Cir. 2010). "Where a defendant argues that the district court should have granted a mistrial due to improper testimony . . . we must first consider whether the challenged testimony was in fact improper." *Id.* Hensley's father claims that because Bossio and Conley testified that they did not consider the results of an inmate's PREA assessment when assigning inmates to dorms, evidence of Hensley's PREA classification was irrelevant. Appellant's Br. at 64–67. However, as just explained, even if officials did not consider the PREA assessment in determining Hensley's dorm assignment, the information was relevant to his cell assignment. The evidence therefore remained relevant following Conley's and Bossio's testimony, and the court's denial of the motion for a mistrial was proper.

### 5. Cumulative Error Analysis

Under the cumulative error doctrine, "a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). Hensley's father has shown, at most, one (harmless) error. So the district court's rulings could not have collectively amounted to a due process deprivation. *See id.* ("In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair.").

### B. Directed Verdict

We next consider the court's grant of a directed verdict to Bossio. We review a district court's grant of a directed verdict, or judgment as a matter of law, de novo. *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013). "This court's standard of review of a motion for judgment as a matter of law is identical to the standard used by the district court." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994). Judgment as a matter of law is appropriate

under Federal Rule of Civil Procedure 50(a) if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on [an] issue," and the claim can "under the controlling law . . . be maintained . . . only with a favorable finding on that issue." Fed. R. Civ. P. 50(a). In a federal question case, we affirm a district court's grant of a Rule 50(a) motion if, viewing the evidence "in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences," we conclude that "reasonable minds could not come to a conclusion other than one favoring the movant." *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996).

Additionally, this circuit applies state law to consider whether Hensley's father is entitled to judgment as a matter of law with respect to his negligence claim. *See J.C. Wyckoff & Assoc., Inc., v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1483 (6th Cir. 1991) ("In federal court diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict."). Under Kentucky law, a trial court may enter a directed verdict if "there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997) (quoting *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992)).

### 1. Eighth Amendment Claim

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Where an inmate's deliberate indifference claim is based on the theory that the official failed to protect him from a substantial risk of serious harm, the inmate must satisfy both objective and subjective components. He must show under the objective prong that he is "incarcerated under conditions

posing a substantial risk of serious harm," *id.* at 834, and under the subjective prong, that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk," *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Hensley's father argues that the court erred in denying his motion because he provided evidence that his son's dorm assignment put him at a high risk of abuse from Bowman, and that Bossio was subjectively aware of that risk after Bowman and Hensley told Bossio their PREA classifications when requesting to be cellmates. Appellant's Br. at 75. In granting the defendants' motion, the magistrate judge explained that the evidence at trial suggested, "at most, a general vulnerability to attack," but that there was not "some specific reason why the defendants should know that Mr. Bowman was a threat to Hensley. And as a result of that, [the evidence] as well can't show any evidence that they knowingly disregarded that risk." Ruling on Mot. for J. as a Matter of Law, R. 175, PageID 2764–65.

Even if we assume that Hensley's father demonstrated that his son faced a substantial risk of serious harm by remaining in the same dorm with Bowman, the claim fails as a matter of law because he did not present evidence suggesting that Bossio exhibited deliberate indifference to that risk. The evidence at trial showed that when Bossio rejected Hensley and Bowman's request to be cellmates, but told them that they could "spend time together" in the same dorm, her instructions were consistent with LSCC policies. An officer is not deliberately indifferent by merely adhering to protocol; particularly where, as here, that protocol was determined to comply with PREA guidelines. *Young v. Campbell Cnty.*, 846 F. App'x 314, 323 (6th Cir. 2021) (holding that a classification officer did not recklessly disregard a risk of serious harm to an inmate by

recommending that the inmate be reclassified, in accordance with prison policies). That Bossio could have done more to ensure Hensley's safety does not render her response deliberately indifferent under the Eighth Amendment. *See id.* ("Although a more diligent officer might have followed up . . . [the defendant's] adherence to protocol cannot sustain a claim of deliberate indifference."); *Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986))).

## 2. Negligence Claim

Hensley's father also challenges the court's award of judgment as a matter of law to Bossio on his negligence claim. To establish that Bossio was negligent, Hensley's father had to show that "(1) the defendant owed . . . [Hensley] a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). Bossio's claimed negligence results in "consequent injury" when there is "legal causation between . . . [her] breach and . . . [Hensley's] injury," which requires proof that Bossio's claimed negligence was a "substantial factor in bringing about the harm." *Id.* at 88–89, 92 (citing Restatement (Second) of Torts § 431 cmt. a). Here, the court correctly entered a directed verdict in favor of Bossio because Hensley's father failed to establish that Bossio's conduct substantially caused Hensley's death.

The court granted a directed verdict to Bossio after finding that she could not reasonably foresee Bowman's harming Hensley. The court determined that nothing about "either individual's history . . . would lead to an awareness" that Bowman was a threat to Hensley. Ruling on Mot. for J. as a Matter of Law, R. 175, PageID 2765. Hensley's father contends that the court erred because he presented evidence from which a jury could infer that Bossio could have anticipated that

Bowman would harm Hensley, and that she breached that duty by failing to place the two in separate dorms. Appellant's Br. at 79–81.

But even if Bossio could have done more to keep Hensley and Bowman separate, Hensley's father did not show that her response to the inmates' request to be cellmates was a substantial factor resulting in Hensley's death. Kentucky law recognizes that a "court has the duty to determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Hammons*, 113 S.W.3d at 92 (quoting Restatement (Second) of Torts § 434(1)(a)). In *Hammons*, the Kentucky Supreme Court held that a mental health services provider was not liable to its client for placing the client in a boarding home where she was assaulted. *Id.* at 93. The plaintiff had been assaulted before at the boarding home and knew it was dangerous, yet insisted on returning to the home. Given these facts, the Kentucky Supreme Court held that any breach of the provider's duty in placing the plaintiff in the home was "'remote and only furnishe[d] the occasion of [the plaintiff's] injury.'" *Id.* (quoting *Commonwealth of Ky., Dep't of Highways v. Graham,*, 410 S.W.2d 619, 620 (1966)); *see also Peak v. Barlow Homes, Inc.*, 765 S.W.2d 577, 579 (Ky. App. Ct. 1988) (holding that defendant's unlawful maintenance of a service entrance did not proximately cause death of driver in the service entrance because "a prior and remote cause creating a condition for an incident to occur in does not in and of itself create liability" (citations omitted)).

In the same way here, Bossio's conduct was too remote to have proximately caused Hensley's death. Admittedly, but for Bossio's permitting Hensley and Bowman to remain in the same dorm, Hensley would not have died. But "[i]n order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent." *Hammons*,

113 S.W.3d at 92 (quoting Restatement (Second) of Torts § 431 cmt. a). Rather, Hensley's father had to present evidence from which the jury could infer that Bossio was somehow responsible for Hensley's death. This he failed to do. The evidence at trial showed that Hensley disregarded Bossio's instruction when he entered Bowman's cell, and the jury found that Maggard was negligent by failing to intervene when he saw the towel covering Bowman's cell door. Hensley's response and Maggard's own negligence did not fall within the "scope of risks" created by Bossio's allegedly negligent response to Hensley and Bowman's request to be cellmates. *Id.* at 93. Accordingly, the jury could not have found an "unbroken connection" between Bossio's conduct and Hensley's demise, such that Bossio's response proximately caused the death. *Nunan v. Bennett*, 212 S.W. 570, 572 (Ky. 1919) (internal citation and quotation marks omitted).

**III.**

We affirm the judgment of the district court.